[Crim. No. 4653. In Bank. Dec. 21, 1945.]

THE PEOPLE, Respondent, v. ROBERT LEE MING, Appellant.

Dorris & Fleharty for Appellant.

Robert W. Kenny, Attorney General, and Walter L. Bowers, Assistant Attorney General, for Respondent.

EDMONDS, J.—After a jury found Robert Lee Ming guilty of murder in the first degree without recommendation as to the punishment which he should suffer therefor, he was tried upon his plea of not guilty by reason of insanity and found to be sane. As grounds for the reversal of the judgment which imposed the death penalty, Ming challenges the constitutionality of the procedure concerning trial of the issue of insanity and also asserts that the district attorney deprived him of rights relating to the examination of jurors.

The record shows that Ming shot and killed his wife and James Graham, a soldier who was her companion at the time of the tragedy. The shooting occurred at the doorway of a hotel in Bakersfield where she was living and each of the victims died almost instantly. Jealousy of his wife, from whom he was separated, was the motive for the homicides. It appears that she had secured an interlocutory decree of divorce, but Ming was insistent that she live with him again. Upon several occasions he had threatened to kill her and, at one time, he said that he would not let any other man have her.

Mrs. Ming and Graham were shot shortly after midnight. Twelve hours before, Ming had attempted unsuccessfully to borrow a .38 revolver from a service station operator. Later he obtained a thirty-thirty carbine and shells from his brother-in-law. About 11 o'clock in the evening he was seen carrying the gun wrapped in a gunny sack. Upon being asked by Alvin Walters, a friend, as to why he was carrying the weapon, Ming replied, "I am going lion hunting tonight. .... A whole gang of us are going." Walters told Ming that he was carrying a concealed weapon and unloaded the gun. Ming placed the shells in his pocket and rewrapped the weapon in a white apron.

Walters then took Ming in an automobile to several places where Ming was supposed to meet the hunting party. Walters noticed that Ming was looking into automobiles which they passed. When they reached a tavern known as the Apex, Ming

said, "Yes, here is where they are." It was about midnight. Ming got out of the car and Walters went home.

After having a drink at the Apex, Ming registered at a hotel under the assumed name of Doctor Prumel. He was still carrying the thirty-thirty with the white cloth around it. Leaving the gun in his room, Ming went to a restaurant. While Ming was there his wife and Graham were sitting in a booth opposite the cash register. After Ming had finished eating, he stood around the cash register for about five minutes conversing with the waitress. When he left he told her: "You remember what date it is, don't forget it."

From the restaurant Ming went by taxicab to the hotel. He was excited and said that because some people for whom he had been looking had arrived before he expected them, he might not come back. He went up to his room, obtained the gun, and returned to the taxicab which had waited for him. He then ordered the driver to take him up and down the streets of Bakersfield. Finally Ming directed the driver to stop the cab in back of a Plymouth coupe parked in front of the Senate Hotel. Ming unwrapped the gun. He informed the driver that the woman in the car directly in front of them was his wife, that she had caused him enough trouble and was stepping out with other men. The driver suggested they go for a ride and talk the matter over. He reached for the ignition switch, but Ming told him to leave it alone, adding: "I know what I am doing."

In about five minutes Mrs. Ming left the coupe. Ming got out of the taxicab and walked to a point midway between the coupe and the door of the hotel, shooting her just as she reached the entrance. She fell and he shot her twice more. Meanwhile, Graham had left the coupe and was crouched down behind it on the street side. Ming turned and fired a shot into the coupe. Graham fell and Ming walked over closer and fired a shot into his head. Throwing the gun to the sidewalk Ming said, "I guess I will hang for this."

Ming then walked to an automobile that had just pulled up to the curb and said to the occupants of the car, "Take me to jail, I shot two people." They started for the county jail, but Ming reminded them that, as the shooting occurred in the city, they should take him to the city jail. When one of the occupants of the automobile remarked that he noticed a soldier lying in the street, Ming replied that he was dead.

Entering the police station Ming told the desk sergeant

that he "just came up to talk to him about radios and he would be up later to see him." Without mentioning the shooting, he left the officer and went to his home, where he was arrested a short time later. At that time Ming asked a police officer if his wife and Graham were dead. He told the officer that he had borrowed the gun from his brother-in-law, and when he saw his wife with the soldier "it just made him mad and he blew up."

The facts regarding the shooting stand undisputed. As a witness in his own behalf, Ming identified letters from his wife dated less than a month before the homicides which tend to show that cordial relations then existed between them. He also said that he had arranged to buy his wife a fur coat selected by her.

In regard to the gun, Ming admitted that he had obtained the weapon from his brother-in-law and remembered talking with Walters about it. He also recalled his remarks about lion hunting and the discussion as to whether the gun was a concealed weapon. Many other events of the fateful evening were also clear in his mind. Concerning his story about lion hunting, he told the jury that no arrangements had been made for such a party nor had he selected a place for the hunt. His justification for this statement was that he had planned to call some persons by telephone and ask them to go with him.

He remembered seeing the waitress at the cafe, but he denied that he saw his wife and Graham there. His intention after leaving the restaurant, he said, was to pick up the gun and go home. He insisted that he did not remember anything from the time he picked up the gun at the hotel until he was standing in front of the desk sergeant at the police station. But in his testimony he recalled that, after reaching home, he had told his mother and father he thought he had killed his wife.

At the trial upon the issue of insanity, three physicians appointed by the court testified that, in their opinion, at the time of the commission of the crime, Ming was sane. Two other doctors also testified to the same effect.

Ming was then 27 years of age. There appears to be nothing unusual about his family history. He left school at the age of 15, upon completion of the ninth grade. He worked on his grandfather's farm while attending school, later in a radio shop, in a CCC camp and at many other places.

Almost a year before this country entered the war, Ming enlisted in the army. As a signal man in charge of communi-

cations, his principal duty was to control the fire of the gun batteries. He told the jury that, while wearing earphones, he received a shock caused by the firing of the guns while the amplifier was on. It made him dizzy but he felt no pain at first, just a ringing. Later he was troubled with vomiting after his meals. While in the army, he had four operations, óne for appendicitis, and three for radical mastoids. Shortly after one of his operations at San Francisco, he said, he procured a two-hour pass. The next thing he remembered he found himself on Main Street in Los Angeles. He reported immediately to the Military Police. He was taken to the hospital and later sent to San Francisco.

In January, 1942, Ming was honorably discharged from the army because of medical disability. After that he worked· for a time as a radio repairman, then for a taxi company, and for different oil companies. While working for the taxi company he met Charlotte Kerr, whom he married.

Ming's father testified that after his son's discharge from the army, he told him that Charlotte had died as the result of eating poisoned fish. Ming complained that his head was killing him. He also said that he was afraid that he was going to kill some one. He was taken to a veteran's hospital where he stayed for three or four weeks.

Ming's mother corroborated her husband in regard to their son's statement concerning the poisoned fish. She said that the son was easily irritated and pounded holes in the wall with his fist. Another witness declared that at one time Ming came home crying; Charlotte had been poisoned, he insisted. According to this witness, even when Ming saw his wife he refused to believe that she was alive.

While the jury ·was being selected the People were represented in the courtroom by Deputies District Attorney Scott and Wooldridge. During the trial on the insanity issue, over the objection of counsel for Ming, Deputy District Attorney Maas took an active part in the presentation of the People's case. The appellant contends that the participation in the trial of an attorney who was not representing the People at the time the jurors were examined in regard to their acquaintance with counsel, deprived the accused of the right of trial by a jury selected in accordance with law and justice. A second ground relied upon for a reversal of the judgment is that sections 1016, 1017, 1020 and 1026 of the Penal Code, which provide that the issues presented by a defendant's plea

of not guilty by reason of insanity must be tried separately from those arising upon the plea of not guilty, deprives the accused of due process of law.

Although Deputy District Attorney Maas participated in the examination of witnesses from the commencement of the trial upon the issue of insanity, no question was immediately raised concerning his appearance on behalf of the People. However, some time later, Ming's attorney objected to his association as counsel upon the ground that he did not take part in the trial at the time of the selection of the jury. When the trial judge, in effect, overruled the objection, no request was made to examine the jurors concerning any acquaintance with Maas, nor did counsel for Ming suggest that there was any reason for such interrogation. Under these circumstances no error is shown.

As to the second contention of the appellant, it is enough to say that the constitutionality of the Penal Code sections specifying the procedure to be followed when a defendant enters a plea of not guilty by reason of insanity has been upheld by this court in a line of unvarying decisions. (*People* v. *Coleman*, 20 Cal.2d 399, 405-406 [126 P.2d 349], and cases cited therein; *People* v. *Crowder*, 69 Cal.App.2d 304, 309 [158 P.2d 988].)

The evidence overwhelmingly shows that Ming is guilty of the unprovoked murder of two persons. Upon a number of occasions he had threatened to kill his wife. For several hours, carrying the gun which he later used, he searched for her and her companion. Although, upon the trial, he denied that he saw his wife and Graham in the restaurant, the surrounding circumstances make his denial unbelievable. He waited around the cash register, which was only a few feet from where the couple were sitting, telling the waitress to remember the date. He then went to the hotel and obtained the gun which he had left there. Finding his wife and Graham, he deliberately fired three times at her, twice after she had fallen, and then twice shot Graham. Five physicians, three of whom were appointed by the court, testified that he .was legally sane. Certainly this constitutes conclusive evidence that Ming is guilty of two crimes of first degree murder and the verdicts as to his sanity find ample support in the record.

The judgment and the order denying a new trial are, and each of them is, affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.