[Crim. No. 5366. In Bank. May 5, 1953.]

THE PEOPLE, Respondent, v. JOSEPH A. DAUGHERTY, Appellant.

Mancuso, Herron & Winn and John Wynne Herron for Appellant.

Edmund G. Brown, Attorney General, Doris H. Maier and Leo V. McInnis, Deputy Attorneys General, and Joseph Maddux, District Attorney (Sonoma), for Respondent.

CARTER, J.—This case comes to us by automatic appeal from a judgment of conviction of first degree murder imposing the death penalty, finding defendant sane, and from

an order denying a new trial. Defendant made the twofold plea of not guilty and not guilty by reason of insanity.

Defendant is a man about 50 years of age. He married Florena Daugherty, the victim of the homicide, in 1933, and they had five children, Barbara, Michael, Wanda, Margaret, and Jerry. The killing occurred in the early morning hours of February 28, 1952. Defendant did not testify at the trial and there was little dispute that he killed his wife Florena, the main contention being that his mind had so deteriorated from illness and the consumption of alcoholic beverages that he was incapable of premeditation or of forming the intent to commit murder.

The homicide took place at the Daugherty family home on the outskirts of Santa Rosa, California. Defendant had not been living at the home for about a month before the time of the crime, having moved to an apartment in town. Prior to the homicide the relation between defendant and Florena had been strained. Barbara, the 17-year-old daughter of the couple, testified that for several years prior thereto they had engaged in constant quarrels and arguments with the defendant accusing Florena of infidelity. On one occasion in 1951, defendant struck Barbara and was arrested therefor. He had made threats against Florena, stating that ''he would come back and get us.'' In December, 1951, defendant had been drinking heavily. He seemed to think his wife was disloyal to him, and while armed with a gun, went looking for her at the house of a tenant nearby his own home. He then fired some shots in the air. Early in 1952, defendant commenced a divorce action against Florena and on the morning of February 27, 1952, the day before the night of the crime, obtained an interlocutory decree by default. He attended to his business, seeming normal, and left a beauty shop owned by him at 4:30 p. m. From about 6:30 to 10:00 p. m. he was with Mrs. Case, an employee, and a friend, Oliver, at either Mrs. Case's apartment or his own, where he consumed considerable whiskey but appeared to be rational. Several witnesses saw defendant between 10 and 11:30 p. m., and they testified that he had consumed whiskey, some of them said he was drunk, others said that he was not drunk but was in high spirits. Between 11 and 11:30 p. m. he called a taxi driver by the name of Bickel from a café in Santa Rosa. Bickel drove him to the Daugherty home. Bickel testified that defendant was in good spirits and happy drunk but acted rationally. While he waited for defendant outside the

Daugherty home, he saw the defendant and Florena in the dining room. Defendant waived a white piece of paper at her (inferentially the interlocutory divorce decree) and she tried to push him out of the house. Defendant left and on returning to the cab stated: "The God damned dirty bitch, she thinks she is smart but I will show her" that he had gotten his "clincher" today and he "just went out there to show her my clincher." Bickel returned the defendant to his apartment at about 11:30 p. m. Between 1:30 and 2:30 a. m. defendant was observed endeavoring to back his car out of his garage and the observer said he was drunk. Defendant called on Mrs. Case and she also considered him drunk. From the testimony of various witnesses and the permissible inferences therefrom, defendant then drove to the Daugherty home and parked his car. Florena, and all the children with the exception of Barbara, were at home. Defendant severed the telephone line on the outside of the house and forced an entry. Florena locked herself in the bedroom but at his insistence let him in. Defendant was holding a hunting knife in his upraised hand, evidently having come to the house armed with it, but put it in his belt at her request. She fled from the house to the yard and he followed her. While there were no eyewitnesses to the crime, he was observed kicking her while she was lying in the yard and he was standing over her. Defendant left and the children, at Florena's request, went to summon help. A neighbor responded, and saw Florena lying on her back in the yard, nude. She was alive and conscious. He drove to town for the police and on their arrival she was still alive, lying nude, her body having blood on it. An ambulance was summoned, and she was taken away. There was blood at various places in the yard and at the door of the house. There were abrasions on her thigh with particles of dirt therein, indicating she had been dragged. Her body contained numerous stab wounds, including some on the upper part of her arm, shoulder, near hip joint, abdomen and forearm. The cartilage of her nose was broken. The fatal wound was on the side of the left breast and was 3 inches wide and 6 inches deep. The evidence showed that the wound had penetrated the heart and would cause death from internal hemorrhage. In addition to the blood in the yard, which covered a considerable area, a blood-stained hunting knife and her torn nightdress were found. A knife scabbard whose inside configuration fit the knife was found at defendant's apartment.

Just prior to his arrest (about 3 a. m. on the day of the crime), defendant made telephone calls to several different persons to whom he stated that he had killed his wife. At the time of his arrest in his office, there was blood on his shirt and pants and about his office and car. Although defendant refused to make a formal statement to the peace officers, when he was asked what had happened at the home place, he stopped, gritted his teeth, and shook his fist at the ground, and said: ''I stood there and watched the dirty son of a bitch die; I couldn't take it any longer.'' When taken to the sheriff's office and examined, he had the divorce decree on his person. He did not appear drunk and while there he told an officer, ''I told her not to push me too far; I told her not to push me too far or I would fix her and I did. . . . The slut, I fixed her.''

The foregoing summary of the evidence is clearly sufficient to establish intentional, premeditated and deliberate murder, or murder in the first degree.

As before stated, the main defense at the trial was that defendant was so deranged by alcohol and illness, that he was incapable of forming an intent or of premeditation. There was evidence, as above seen, that he was intoxicated on the night in question and evidence to the contrary. He had witnesses in his defense who testified to his intoxication then, and overindulgence in alcohol for a considerable period of time prior thereto, coupled with his suffering from Buerger's Disease and other ailments; that defendant had changed and was sullen and morose. His personal physician testified that defendant was suffering from heart disease, ulcers, bladder trouble, Buerger's Disease and chronic alcoholism and, because of those things, that when he committed the offense he did not have the capacity to form the intent to commit murder. However, on rebuttal, the prosecution called Dr. Toller, a psychiatrist, who testified that he did have such capacity as shown by his activities on the night in question.

Defendant relies on recent cases by this court in support of his contention that there was insufficient evidence to establish premeditation as lately defined by this court. The facts in those cases are not comparable to the one here presented. Defendant stresses the language in *People* v. *Howard,* 211 Cal. 322 [295 P. 333, 71 A.L.R. 1385], that there was no evidence of the surrounding circumstances at the time of the killing. Here, as above outlined, we have such evidence and, together with the inferences to be drawn therefrom, it is

sufficient. In *People* v. *Holt,* 25 Cal.2d 59 [153 P.2d 21], a previous threat to kill was held insufficient but that was in the background of defendant's testimony that the deceased was advancing upon him when he shot him and he fired but one shot which was not immediately fatal. Here many wounds were inflicted and defendant had pursued Florena. Reliance is also placed on *People* v. *Thomas,* 25 Cal.2d 880 [156 P.2d 7], but there the court held the evidence sufficient. Evidence such as exists here was not present in *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8], where the only "rationale" was a "tempestuous quarrel, hot anger and a violent killing." Special reliance is placed upon *People* v. *Jiminez,* 95 Cal.App.2d 840 [214 P.2d 15]. In that case there was not all the evidence of threats and statements made by defendant, as well as evidence of torture, shown by the record here. The statement therein that courts are bound by the rule that where evidence is open to two equally reasonable constructions, one of which points to the guilt of defendant of a higher degree of crime, and the other to his guilt of a lesser degree, the court must adopt the theory pointing to guilt of the lesser degree, is not a correct statement of law when applied to the consideration of a case by an appellate court. That rule applies to the trier of fact only, be it jury or trial court, the same as does section 1096 which deals with reasonable doubt. The court in the Jiminez case cites section 1097 of the Penal Code which reads: "When it appears that the defendant has committed a public offense, and there is reasonable ground of doubt in which of two or more degrees he is guilty, he can be convicted of the lowest of such degrees only." But that section is in a chapter of the code dealing with the *trial* of a case. Also cited in the Jiminez case are *People* v. *Golembiewski,* 25 Cal.App.2d 115 [76 P.2d 717] and *People* v. *Daniel,* 65 Cal.App.2d 622 [151 P.2d 275]. In the Golembiewski case there was no evidence of the higher offense and the court was speaking of the duty of the trier of fact. The Daniel case relied on the rule in connection with the power of the trial court to reduce the degree of the crime under section 1181(6) of the Penal Code, but we held the rule was the same under that section (1181(6)) as it was under section 1260 of the Penal Code and in neither case may the court reduce the degree of the crime unless the evidence is legally insufficient to support the higher degree of which defendant was convicted, and in determining that question, the evidence, even if circumstantial, is not weighed.

(*People* v. *Odle,* 37 Cal.2d 52 [230 P.2d 345].) The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact. It is not whether guilt is established beyond a reasonable doubt. (*People* v. *Stephens,* 66 Cal.App.2d 755 [152 P.2d 1019]; *People* v. *Wright,* 94 Cal.App.2d 70 [210 P.2d 263].) **[5]** The rule is stated in *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778], rejecting a contrary statement in *People* v. *Lamson,* 1 Cal.2d 648 [36 P.2d 361] and *People* v. *Staples,* 149 Cal. 405 [86 P. 886]: ''The rule applicable where there is evidence, circumstantial or otherwise, that a crime has been committed and that the defendant was the perpetrator thereof, has been many times reiterated by the reviewing courts of this state as follows: The court on appeal 'will not attempt to determine the weight of the evidence, but will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt. For it is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence, and before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground' of insufficiency of the evidence, 'it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. The determination of a charge in a criminal case involves proof of two distinct propositions: First, that the offense charged was committed, and second, that it was perpetrated by the person or persons accused thereof. . . . We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.' If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury. (*People* v. *Perkins,* 8 Cal.(2d) 502 [66 P.2d 631]; . . .) In the Perkins case this court expressly rejected the application of the statement from the Staples case to a situation which involved only circumstantial evidence. As pointed out by the court the rule that the circumstances relied upon by the prosecution must be consistent with guilt and inconsistent with an hypothesis of innocence is a rule of instruction for the jury, and is not the rule for the guidance

of the court on review. It said: 'The rule above announced does no more than to instruct the jury that, if a reasonable doubt is created in their minds for any reason, they must acquit the defendant. But, where the jury rejects the hypothesis pointing to innocence by its verdict, and there is evidence to support the implied finding of guilt as the more reasonable of the two hypotheses, this court is bound by the finding of the jury.' " That rule has been consistently followed. (*People* v. *Reed*, 38 Cal.2d 423 [240 P.2d 590]; *People* v. *Cullen*, 37 Cal.2d 614 [234 P.2d 1]; *People* v. *Jones*, 36 Cal.2d 373 [224 P.2d 353]; see cases collected and discussion, 4 Cal.Jur. 10-Yr.Supp. [1943 Rev.], pp. 967-971.) ■ Without doubt the same rule applies in determining whether the evidence does or does not support a conviction of a higher degree of a crime, and an appellate court cannot reduce the degree if there is substantial evidence to support the finding of a higher degree. The same comments are applicable to the other cases relied upon by defendant.

In connection with the claimed insufficiency of the evidence, defendant asserts there was no evidence of torture. (Murder committed by torture is first degree. Pen. Code, § 189.) There was sufficient evidence from which the jury could find torture. ■ Murder is perpetrated by torture "when 'the assailant's intent was to cause cruel suffering on the part of the object of the attack, either for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity.' (*People* v. *Tubby*, 34 Cal.2d 72, 77 [207 P.2d 51]; *People* v. *Bender*, 27 Cal.2d 164, 177 [163 P.2d 8].)" (*People* v. *Martinez*, 38 Cal.2d 556, 561 [241 P.2d 224].) ■ The manner of the killing does not necessarily establish torture (see *People* v. *Tubby*, 34 Cal.2d 72 [207 P.2d 51]). ■ However, here the defendant husband threatened to do things to the wife because he considered she had been, and was, unfaithful to him although there was no evidence to that effect. His remarks to Bickel, the taxi driver, before the killing indicate as well as an intent to kill, a wish to seek vengeance on her so as to cause her to suffer. The same is true of his remarks after the killing. At the time of the killing he was armed with a knife and pursued her from the house into the yard and from the size of the area where blood was found, his pursuit and the stabbing of her must have covered an appreciable time. He tore her nightgown from her, stabbed her several times and, from the dirt-filled abrasions on her thigh, must have dragged her along the ground. He evi-

dently struck her in the face. And finally, when she was lying on the ground but still alive, he stood over her and kicked her. The evidence was sufficient to permit the jury to conclude that the murder was perpetrated by torture. (See *People* v. *Martinez, supra,* 38 Cal.2d 556.)

On *voir dire* examination, Juror Mickelsen stated that although she had read about the case she had formed no opinion concerning it; had no conscientious scruples against the death penalty, the use of intoxicating liquors, or the defense of insanity; that she did not know Charles DeMeo, one of the defendant's counsel, or Sullivan, defendant's other counsel, who conducted the trial, or the district attorney and had had no contact with any of them. In support of his motion for a new trial, defendant produced affidavits from which it appears that Charles DeMeo is a member of a law firm of which J. N. DeMeo is also a member. Prior to the trial, the firm, through J. N. DeMeo, represented one Grundstrom as plaintiff in a divorce action. Concerning that representation and the action taken therein, Charles DeMeo had no actual knowledge until investigation after the trial. Grundstrom was granted a divorce and custody of the children with right of visitation in the defendant therein. In connection with that case, J. N. DeMeo had written two letters to a Mrs. Peter Michelsen, Route 4, Box 135, Petaluma, California. (The Mrs. Mickelsen who was on the jury appears under the name of Mrs. Leda F. Mickelsen, Bodega Highway, Route 4, Box 199, Petaluma.) In the first letter (July 16, 1950), J. N. DeMeo wrote her that Grundstrom had complained that she had endeavored to entice one of the children away from him and that if she did not desist, Grundstrom would have to forbid her seeing the child. In the second letter (March 26, 1952) J. N. DeMeo stated that Grundstrom had again complained; that she had ignored the former letter, and that the child could visit her once a week for two and one-half hours; that she was to stop the above mentioned activities, or legal action would be taken. Apparently the Mrs. Mickelsen to whom the letters were addressed was the maternal grandmother of the child. No answers to the letters were received. It was further stated in the affidavits that had counsel known of the situation they would have pursued an inquiry as a basis for challenge for cause or would have exercised a peremptory challenge against Mrs. Mickelsen. Defendant claims that the letters would cause Mrs. Mickelsen to be unfriendly towards the DeMeos and that a fair trial was denied because of Mrs. Mickelsen's false

testimony on the *voir dire* that she did not know and had no contact with any of the attorneys in the case. There may have been some doubt as to whether Juror Mickelsen and the one to whom the letters were sent were the same person for the names and addresses are to some extent different. Aside from that, however, we do not believe defendant suffered prejudice. Mrs. Mickelsen was technically truthful in her answer that she had no contact with any of the attorneys in the case for she had had none with Charles DeMeo who was in court assisting with defendant's defense. The letters were written by J. N. DeMeo, and as far as appears, she had never seen either of them and had no reason to believe they were partners. It is very doubtful if she realized that there was any connection between Charles DeMeo and the incident of the letters. If anything, Charles DeMeo, as a partner, might have J. N. DeMeo's knowledge imputed to him. The letters do not necessarily indicate that Mrs. Mickelsen would be angered with J. N. DeMeo. At least not to the extent that she would carry it over to Charles. In addition, she had given her sworn statement that she would be impartial. Moreover, she made affidavit on the motion for a new trial, "That before being selected as a trial juror in said cause, and while being questioned on voir*e* dire examination, affiant stated under oath that she had no fixed opinion regarding the merits of the case which would prevent her from trying the case solely upon the evidence adduced at the trial. That during the course of the said trial affiant frequently heard the admonition of the trial judge that the jurors should not form or express any opinion about the merits of the case until it was finally submitted to them, and affiant hereby states that she faithfully observed said admonition. That during the trial of the said case and before it was finally submitted to the jury affiant did not form or express any opinion about the merits of the case.

"That during the trial, before it was submitted, affiant did not, at any time, express any opinion regarding the merits of the case, nor did affiant overhear any other member of the jury state any such opinion."

Further in connection with Mrs. Mickelsen, the affidavit of one Graham was filed in which he stated that he was in the corridor of the courthouse after the jury had reached its verdict and had stated to Mrs. Mickelsen who was there, " 'It seems phoney that they could get a verdict that quick on as large a trial as that.'

". . . [Mrs. Mickelsen] responded: 'Why?'

"Affiant answered: 'Because he is a sick man.'

". . . [Mrs. Mickelsen] responded: 'I am one of the jurors, I'm sick too. I have hemorrhoids and I haven't killed anybody.'

"Affiant then said: 'How did you arrive at a verdict that quick?'

". . . [Mrs. Mickelsen] responded: 'Well, we already knew it,' and then walked away."

Mrs. Mickelsen's affidavit creates a conflict with any inference from that conversation that she had prejudged the case for she said she had formed no opinion and the trial court's resolution of that conflict against defendant is binding on this court. (*People* v. *Henderson*, 79 Cal.App.2d 94 [179 P.2d 406].) Moreover, her statement does not necessarily indicate a prejudgment of the case for she may merely have meant that a short time after the case was submitted to the jury it knew how it felt about the matter. Nothing in *People* v. *Galloway*, 202 Cal. 81 [259 P. 332], requires a holding of error here. There the court was concerned with the question of whether bias on the part of a juror could be shown when it was evinced by statements made before and during the trial, but had been concealed by the juror on *voir dire*. Whether bias was in fact shown or what its effect may have been was not involved.

Complaint is made by the defendant in regard to Juror Schmidt. Schmidt testified on *voir dire* that there was nothing in his present state of mind that would prevent him from being an impartial juror except what he had read in the newspaper; that he had an opinion based solely on what he had read in the newspaper as to the guilt or innocence of defendant, but he had an open mind and could put it aside and be guided in his verdict solely by the evidence. On examination by defendant's counsel he said he still had the opinion he had formed and it would continue unless he heard evidence that removed it; that unless he did hear evidence to remove his opinion and some feeling of prejudice he would still have it at the end of the trial. Defendant's challenge for cause of Schmidt was denied, the court remarking that it did so on the ground that the juror had said he would cast aside his impression gained from reading the paper and determine the case on the evidence. The court then asked Schmidt whether he could act fairly and impartially in the light of the evidence received, to which an affirmative reply was given.

The rule is stated: ". . . but no person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon public rumor, statements in public journals, circulars, or other literature, or common notoriety; provided, it appear to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such an opinion, act impartially and fairly upon the matters to be submitted to him." (Pen. Code, § 1076.) That test was met here. (See *People* v. *Collins*, 105 Cal. 504 [39 P. 16]; *People* v. *Warner*, 147 Cal. 546 [82 P. 196]; *People* v. *Wolff*, 182 Cal. 728 [190 P. 22].) There is nothing in *People* v. *Helm*, 152 Cal. 532 [93 P. 99], that requires a different result. Moreover, even if the juror's testimony with respect to the test is conflicting, the trial court's resolution of that conflict is binding on the appellate court. (*People* v. *Eudy*, 12 Cal.2d 41 [82 P.2d 359].)

The trial was not fair, urges defendant, because the jury and judge were dominated by mob psychology and were prejudiced; that the jury reached a verdict in so short a time that it must have been prejudiced. So far as the first contention is concerned, there is nothing in the record to substantiate the charge and this is the first time the claim has been made. Indeed, an examination of the record reveals the opposite of defendant's contention.

On the second point it may be noted that the jury took an hour and a quarter to reach its verdict on the first phase of the trial. While the record consists of some 1,274 pages, the defendant's only defense at the trial was, as above stated, that defendant was so befuddled by alcohol and illness that he could not form an intent and was incapable of premeditation or deliberation. There was no question that defendant killed Florena and the evidence of torture and premeditation and that his mind was not so affected is adequate. Inasmuch, however, as there were no eyewitnesses to the killing, most of the record consists of the People's structure of a case based on circumstantial evidence. On the record we do not believe the time consumed in reaching the verdict was so short as to indicate a failure to consider the evidence or of bias or prejudice or the denial of a fair trial.

It is contended that the court was guilty of misconduct which deprived the defendant of a fair trial on the issue of sanity. The same jury tried both sections of the trial. Immediately after the jury returned its verdict to the court,

the latter remarked: "Ladies and gentlemen of the jury, this has been a most unpleasant and a most difficult duty. You have discharged that duty conscientiously and, *in my opinion, as the evidence in the case warranted.*" (Emphasis added.) Defendant moved for a mistrial and that the jury be discharged and another impanelled to try the sanity issue. The motion was denied. It is asserted that the italicized comment was particularly prejudicial because the last witness on the stand to testify on the issue of defendant's guilt was a Doctor Toller, the People's rebuttal witness, who testified that defendant did have the mental capacity to form an intent and was capable of premeditation and that the comment, in effect, told the jury that his testimony, which was fresh in the jury's mind, was properly believed; that the same doctor testified for the People that defendant was sane at the trial of the sanity issue.

In addition to the foregoing, it should be mentioned that at the beginning of the sanity trial, the court told the jury that in considering the evidence, they were "the sole judges of the evidence and of the credibility of the witnesses and [of] the weight to be given to the evidence and testimony, and you are to determine the issues presented upon this phase . . . without regard to any intimation,—reputed intimation, that may have been made heretofore concerning the determination of the issues presented upon the first phase of the case. The defendant is entitled to your calm, unbiased and unprejudiced judgment upon the issue upon which we are now to receive testimony. You understand that do you, ladies and gentlemen? (Jurors answer in affirmative.)" At the end of that trial, the court again admonished the jury, saying "The Court has nothing to do with the determination of questions of fact. Whatever the Court may have said during the progress of the trial, and particularly what the Court may have said at the conclusion of the first phase of this trial, or may intimate, or have intimated, in its instructions, with respect to the evidence, its weight, effect [sic] or sufficiency, must in no way influence your verdict, and if there be any such intimation the same must be wholly and completely disregarded by you. If, in stating to you any proposition of law the Court has inadvertently indicated any material fact, or facts, to have been proved, you will disregard such intimation and draw your own conclusions from the evidence herein. That is a duty resting solely upon you, ladies and gentlemen, without intimation or guidance in any shape or manner from the

Court." It should also be pointed out that on the sanity issue the prosecution presented, in addition to Dr. Toller, two other doctors appointed by the court, who twice examined defendant, and who testified he was sane. Defendant called several relatives and intimate friends, his personal doctor, a psychologist, and a psychiatrist, who testified that defendant was insane. While there was a sharp conflict in the evidence, there was ample evidence to support the determination that defendant was sane.

It is doubtful that the error, if any, in the court's comment was prejudicial in view of the adequacy of the evidence, his strong admonitions to them, and the casual nature of the remark buried as it was in the common laudatory statement regarding the performance by the jury of its duty and the fact that it was made before the sanity hearing began. When we consider those circumstances together with the power of the court to comment on the credibility of testimony provided he tells the jury it is the exclusive judge of all questions of fact and credibility of the witnesses (Cal. Const., art. VI, § 19), we find no prejudicial error. (See *People* v. *Ottey,* 5 Cal.2d 714 [56 P.2d 193] ; *People* v. *Patubo,* 9 Cal.2d 537 [71 P.2d 270, 113 A.L.R. 1303] ; *People* v. *Gosden,* 6 Cal.2d 14 [56 P.2d 211] ; *People* v. *De Moss,* 4 Cal.2d 469 [50 P.2d 1031] ; *People* v. *Eudy, supra,* 12 Cal.2d 41.) At most the court said that in his opinion evidence was sufficient and the credibility of the prosecution witnesses on mental ability was satisfactory. The trial of the sanity issue involved an issue entirely different from the question of the capacity to form an intent in the not guilty trial (*People* v. *Wells,* 33 Cal.2d 330 [202 P.2d 53]) and the jury was so instructed (as later discussed). Additional witnesses were offered by both sides at the sanity hearing.

Defendant relies upon *People* v. *Pokrajac,* 206 Cal. 259 [274 P. 63], where the court's remark, after the trial on the not guilty plea but before the sanity trial, that the jury's verdict was "undoubtedly" a correct one was held prejudicial error which had not been cured by the admonition to the jury. The remarks there made were far stronger than those here involved and, too, that case was decided prior to the amendment to the Constitution in 1934, authorizing comment on the evidence. This was pointed out in *People* v. *Busby,* 40 Cal.App.2d 193, 202 [104 P.2d 531], where, between the sections of the trial, the court told the jury it had acted intelligently: "Appellant contends that the language of the

court expressed approval of the jury's verdict and had a tendency to minimize the importance of the insanity issue. As authority they cited *People* v. *Pokrajac,* 206 Cal. 259 [274 Pac. 63], where somewhat similar comment made by the trial judge was held to be reversible error.

". . . since the Pokrajac case was reported, the amendment to the California Constitution, permitting the trial judge to comment upon the evidence, has gone into effect. (Cal. Const., art. VI, sec. 19.) It has been held that this right of comment even permits a trial judge, in proper cases, to express an opinion as to the guilt of the defendant. (*People* v. *Ottey,* 5 Cal.(2d) 714 [56 P.(2d) 193].)

"The fact that the trial judge's remarks were made before the trial on the insanity issue rather than during its progress, gives rise to no distinction as the trial on the substantive charges and the insanity issue constitute but a single trial. (*People* v. *Troche,* 206 Cal. 35 [273 Pac. 767].)

"The jurors were fully and correctly instructed as to the effect that they were the sole and exclusive judges of the effect and value of evidence and of the credibility of witnesses. The remarks of the trial judge did not constitute reversible error."

██ Defendant contends that sections 1016 and 1026 of the Penal Code, providing for a double plea of not guilty and not guilty by reason of insanity and a bifurcated trial on the issues, violate the due process clauses of the Constitutions of the United States and the State of California and that the cases beginning with *People* v. *Troche,* 206 Cal. 35 [273 P. 767] and *People* v. *Leong Fook,* 206 Cal. 64 [273 P. 779], to the contrary should be overruled. (See, also, *In re Slayback,* 209 Cal. 480 [288 P. 769]; *People* v. *Dias,* 210 Cal. 495 [292 P. 459]; *People* v. *D'Angelo,* 13 Cal.2d 203 [88 P.2d 708]; *People* v. *Cordova,* 14 Cal.2d 308 [94 P.2d 40]; *People* v. *Ming,* 27 Cal.2d 443 [164 P.2d 487]; *People* v. *Wells,* 33 Cal. 2d 330 [202 P.2d 53].) We see no occasion for reconsidering our decisions in those cases. No new grounds are advanced.

██ The right and wrong test of insanity is criticized as cruel and unscientific, that it is not the common or statutory law of this state and the cases declaring it to be the test should be overruled. The most recent reaffirmation of the test was made by this court in *People* v. *Wells, supra,* 33 Cal.2d 330, 349: "Commission of the overt act is conceded but criminal guilt (the mental capacity to commit a criminal act) is denied *upon the sole ground* that at the time the overt act was

committed the defendant was suffering such 'a defect of reason, from disease of the mind . . . as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know he was doing what was wrong.' (7 Cal.Jur. § 21, p. 862; *People* v. *Troche* (1928), *supra*, 206 Cal. 35, 46.)

"... The standard by which the trial judge must appraise the admissibility of evidence in every case is, of course, the familiar 'right or wrong' standard hereinabove quoted, by which legal insanity as a defense is gauged.

"... Legal sanity, in a criminal case, under our court declared law, means 'reasoning capacity sufficient to distinguish between right and wrong as to the particular act he is doing, knowledge and consciousness that what he is doing is wrong and criminal and will subject him to punishment.' (*People* v. *Sloper* (1926), 198 Cal. 238, 245 [244 P. 362], and cases there cited.)" That has been the rule since the first decision in this state (*People* v. *M'Donnell*, 47 Cal. 134) and has been followed consistently (see cases collected 7 Cal.Jur. 862-863) despite voluminous critical writings on the subject. It is the generally accepted rule. (41 Am.Jur., Criminal Law, §§ 33, 40; 44 A.L.R. 584; 22 C.J.S., Criminal Law, § 59; Wharton's Criminal Law, §§ 50-52; Warren on Homicide, § 61.) Defendant has not offered a more workable test and if it is to be changed his argument should be addressed to the Legislature. Indeed, such attempts have been made without avail. We find no valid reason, therefore, for adopting a different test.

Section 3604 of the Penal Code provides that punishment of death shall be inflicted by the administration of "a lethal gas." Defendant contends that the provision is invalid because of uncertainty in that it permits the imposition of cruel and unusual punishment contrary to the federal Constitution in that the executioner could use a lethal gas which would cause long and cruel suffering. It is doubtful that this question is properly raised on this appeal since ordinarily we are not concerned with the execution of the judgment and there is no showing that such a gas has ever been used or will be used in this case. In any event, the contention is satisfactorily answered in *State* v. *Gee Jon*, 46 Nev. 418 [211 P. 676, 30 A.L.R. 1443], where similar contentions and a similar statute were involved. The court said: "But we are not prepared to say that the infliction of the death penalty by the administration of lethal gas would of itself subject the victim

to either pain or torture. Counsel say we must take judicial notice of facts and conclusions reached as the result of scientific research, and it is insisted that from the knowledge thus acquired we must declare that the law in question provides a cruel and inhuman method of enforcing the death penalty. Without undertaking to state the limitations of the rule invoked, we may say that if we are controlled by our scientific knowledge of the subject we must reject counsel's contention. For many years animals have been put to death painlessly by the administration of poisonous gas. Gas has been used for years by dental surgeons for the purpose of extracting teeth painlessly. No doubt gas may be administered so as to produce intense suffering. It is also true that one may be executed by hanging, shooting, or electrocution in such a bungling fashion as to produce the same result. But this is no argument against execution by either method.

''The revulsion on the part of many to the idea of execution by the administration of gas is due to an erroneous impression. The average person looks upon the use of gas with horror, because of the experiences incident to the late war. They forget that there are many kinds of gas, ranging from the harmless nonpoisonous tear gas, which may be used for the quelling of a mob, and the ordinary illuminating gas, which may produce painless death, to the highly poisonous gas which sears and destroys everything with which it comes in contact. It may be said to be a scientific fact that a painless death may be caused by the administration of lethal gas. That suffering and torture may be inflicted by its administration is no argument against it. We must presume that the officials intrusted with the infliction of the death penalty by the use of gas will administer a gas which will produce no such results, and will carefully avoid inflicting cruel punishment. That they may not do so is no argument against the law.

''We think it fair to assume that our Legislature, in enacting the law in question, sought to provide a method of inflicting the death penalty in the most humane manner known to modern science. If the argument made in behalf of the unconstitutionality of the act is sound, the Legislature can provide no method of inflicting the death penalty other than that now in vogue. In other words, science and progress must halt when face to face with a long-established usage. Such was not the spirit which prompted the incorporation into our organic law of the provision now invoked. Every enactment of our Legislature must be deemed in harmony with our constitu-

tional provisions until the contrary clearly appears. The Legislature has determined that the infliction of the death penalty by the administration of lethal gas is humane, and it would indeed be not only presumptuous, but boldness on our part, to substitute our judgment for theirs, even if we thought differently upon the matter.

". . . We can find no ground upon which to sustain appellants' contention. . . . Nor do we find any merit in the contention that the act is indefinite and uncertain. It is certainly no more so than the act which it purports to amend. Rev. Laws 1912, § 7281. That statute simply said that the punishment of death should be inflicted by hanging the defendant by the neck until he is dead, or by shooting him, at his election. The present statute provides that the judgment of death shall be inflicted by the administration of lethal gas, and that a suitable and efficient inclosure and proper means for the administration of such gas for the purpose shall be provided. We cannot see that any useful purpose would be served by requiring greater detail. Certainly, the statute infringes no provision of the Constitution."

Finally, the defendant questions the jury instructions. ▮▮▮ First, it is asserted that the instructions on reasonable doubt at the not guilty stage of the trial were insufficient; that the jury was not advised that each fact necessary for the crime must be proven beyond a reasonable doubt and particularly it was not told that intent must be so proven.

The jury was instructed that the burden of proof was on the prosecution; that all presumptions are in favor of the accused; that if there is a reasonable doubt as to whether the circumstances point to defendant's guilt he should be given the benefit of that doubt and a verdict of acquittal reached. The court quoted section 1096 of the Penal Code which states that the accused is presumed to be innocent, that if there is a reasonable doubt of his guilt he is entitled to an acquittal, and defines reasonable doubt. The jury was instructed that the plea of not guilty is a denial by him of each and every element of the offense charged; that the duty is on the prosecution to prove every fact necessary to constitute the crime; that in a criminal, as distinguished from a civil case, guilt must be established beyond a reasonable doubt; that defendant's plea of not guilty puts in issue every fact alleged in the indictment and every material element of the crime; that he may rest on that denial and if the evidence did not satisfy it of defendant's guilt beyond a reasonable doubt he

should be acquitted; that in every crime there must exist a union, or joint operation of act and intent (Pen. Code, § 20) and that a person has no capacity to commit a crime if it was through accident and without evil design or intent (Pen. Code, § 26); that ''Specific intent is an element of the offense charged here, and this presents a question of fact which must be proved like any other fact in the case''; that ''It is the law of this state that an act done in the absence of the will is not any more the behavior of the actor than is an act done contrary to his will. If you believe beyond a reasonable doubt and to a moral certainty that the defendant committed the act charged in the indictment, and if you further believe from the evidence that he was not conscious thereof and was not acting while in full possession of his will and that he could not formulate or hold the specific intent to commit the act charged, or if, from the evidence herein, you entertain a reasonable doubt that defendant was conscious at said time and was not acting in full possession of his will and could not formulate or hold the specific intent to commit the act charged, then you should find him not guilty as to said indictment.'' We think the jury was adequately instructed that defendant must be proven guilty beyond a reasonable doubt of every fact constituting the crime; the specific intent was an element required and, specifically, that they must find beyond a reasonable doubt that he had the mental capacity to form an intent. There were, therefore, instructions that intent must be proven beyond a reasonable doubt.

Moreover, under the statute no instruction on reasonable doubt other than that specified in the Penal Code, section 1096 need be given (Pen. Code, § 1096a) and as said in *People* v. *Reed*, 38 Cal.2d 423, 430 [240 P.2d 590], ''The court may couch its instructions defining the elements of the offense in the language of the code where no instructions in elaboration or exposition of the principles of the statutory definitions are requested by the defendant. (*People* v. *Treschenko*, 159 Cal. 456, 458 [114 P. 578].) Even if such an instruction 'cannot be commended as a full or clear exposition of the meaning of the section of the code, still it cannot be said that it was error for the court in giving the law to have conformed to the language of the code, and to have omitted what that code itself omits.' (*People* v. *Dobbins*, 138 Cal. 694, 698 [72 P. 339].) The defendant will not be heard to complain where he has failed to request an amplifica-

tion of an instruction in that form. (*People* v. *Laird*, 69 Cal. App. 511, 514 [231 P. 596].)

". . . The court's instruction on the presumption of innocence and defining reasonable doubt followed the language of section 1096 of the Penal Code. By additional instructions, the court explained the effect of the presumption and stated the doctrine of reasonable doubt.

"These instructions, Reed complains, are only general. No instruction was given to the effect that each element of the crime must be proved beyond a reasonable doubt. But the law expressly specifies that the court may read section 1096 of the Penal Code and need not give any other instruction on the presumption of innocence or reasonable doubt. (Pen. Code, § 1096a.) Considering all of the instructions, it appears that the jury was fully and fairly instructed as to all of the rules of law applicable to the evidence."

■ Second, it is claimed that the instructions on torture were in error. The instructions given were in the language defining torture in *People* v. *Martinez, supra,* 38 Cal.2d 556, 561, and there is, therefore, no error.

■ Third, complaint is made of instructions in the insanity stage of the trial. The court refused to give defendant's instruction that he need not prove his insanity beyond a reasonable doubt but need only prove it by a preponderance of the evidence, defining the latter clause. In the insanity stage of the trial the burden of proof rests on defendant to prove his insanity by a preponderance of the evidence. (*People* v. *Hardy,* 33 Cal.2d 52 [198 P.2d 865] and cases there cited.) Hence defendant's offered instruction was correct. In connection with the court's refusal to give this instruction, defendant particularly complains of the instruction hereafter to be mentioned.

■ The jury was instructed that it was not to rely upon any particular instruction but to take them as a whole; that defendant was entitled to the full benefit of the defense of insanity if it believed that the defense had been established by a "preponderance of the evidence"; that it was the sole judge of the evidence and credibility of witnesses; that it was to give defendant the benefit of every reasonable doubt (this should probably not have been given) ; that "To the charge of murder made against the defendant he has interposed the plea of 'not guilty' and 'not guilty by reason of insanity.' The law requires that where such pleas are entered, the defendant must first be tried under the general issue of 'not

guilty', during which trial he is conclusively presumed to have been legally sane at the time the offense is alleged to have been committed; all evidence relating to the question of legal sanity of the accused being excluded, and, at the conclusion of such trial the defendant shall be tried upon the issue of legal insanity. Accordingly, in the present case, during the first phase of this trial under the general issue of 'not guilty,' the defendant was conclusively presumed to be sane, and any evidence bearing upon the question of his legal sanity was not relevant to that issue and you were precluded by the law from considering the question of the legal sanity of the defendant on the first phase of this trial. The first phase of this trial having resulted in a verdict of guilty, the defendant is entitled under his plea of 'not guilty by reason of legal insanity' to a trial upon that issue and to introduce any legal evidence tending to establish such plea.

"The defendant in this case heretofore has been charged with the crime of murder and has been found guilty of that offense, except in this respect: That defendant has entered a plea of 'not guilty by reason of insanity', thereby alleging that he was insane at the time of the commission of the offense. . . . The issue raised by that plea of insanity now must be determined, because the law does not hold a person criminally accountable for his conduct if at the time thereof he was insane." Insanity was defined for the jury and it was told that if it believed from a "preponderance" of the evidence that defendant was insane it should so find; that "The burden of proving insanity is on the defendant; that is to say, it is incumbent upon him to establish by a preponderance of evidence that he was insane. . . .

"The law presumes that the defendant was sane. That presumption may be rebutted but is controlling until overcome by a preponderance of evidence. . . .

"The rule requiring the defendant, where insanity is interposed as a defense, to prove it by a preponderance of the evidence does not affect the other rule that the burden of proving sanity is on the prosecution. The burden has always been on the prosecution and is met in the first instance by the presumption of sanity which the law raises and which must prevail until it is overcome. The rule relating to the defense of insanity does not shift the burden of proof from the People to the defendant, but only shifts the burden of introducing evidence and declares the amount or quantum of evidence which he must produce to overcome the presumption

and show his insanity. The present status does not take away the defense of insanity, and the procedure followed has in no way changed or affected the rule respecting the burden which rests on the prosecution and on the defense in this case.

"It follows, therefore, that the burden on the prosecution of proving the sanity of the defendant at the time of the commission of the crime of which he has been found guilty, namely, murder of the first degree, *beyond a reasonable doubt, is met by the presumption of sanity, and the burden of establishing the defense of insanity of the defendant is upon him, to establish such insanity at the time of the commission of the crime of which he has been convicted, by a preponderance of the evidence,"* (emphasis added). Other instructions referred to preponderance of the evidence and gave more detailed definitions of insanity.

The italicized portion of the instructions, *supra,* is prejudicially erroneous, asserts defendant, because it in effect told the jury that the prosecution had to prove sanity beyond a reasonable doubt and that it had done so by the presumption of sanity; that, therefore, in effect, defendant would have to overcome a presumption of sanity beyond a reasonable doubt and that means more than by a preponderance of the evidence.

There is no doubt that the instruction is confusing and should not have been given. However, it may reasonably be interpreted to mean that even though the prosecution was relieved of proving sanity beyond a reasonable doubt yet the defendant could establish his insanity by a preponderance of the evidence and that construction is clearly in harmony with the other instructions on the subject that a preponderance of the evidence was all defendant needed to produce.

 There has been considerable discussion with reference to the correct rule in regard to who carries the burden in the sanity stage of the trial. (See 26 Cal.L.Rev. 543; 2 So. Cal.L.Rev. 53; 3 *ibid.* 1; 21 Cal.L.Rev. 65; 26 Cal.L.Rev. 544.) It was held in *People* v. *Hickman,* 204 Cal. 470 [268 P. 909, 270 P. 1117], that the rule is the same now as it was before the bifurcated trial provision which was enacted in the 1927 amendment to section 1026 of the Penal Code. In the Hickman case, *supra,* it was held that a person is presumed to be sane and "The rule requiring the defendant, where insanity is interposed as a defense, to prove it by a preponderance of the evidence, does not affect the other rule that the burden of proving sanity is on the prosecution. That burden

has always been on it and is met in the first instance by the presumption of sanity which the law raises and which must prevail until it is overcome. The rule relating to the defense of insanity does not shift the burden of proof from the People to the defendant, but only shifts the burden of introducing evidence and declares the amount or *quantum* of evidence which he must produce to overcome the presumption and show his insanity. (*People* v. *Harris,* 169 Cal. 53, 68 [145 Pac. 520].)'' (*People* v. *Hickman, supra,* 204 Cal. 470, 477.) But the cases also have stated that the burden is on the defendant to prove insanity by a preponderance of the evidence. ''There are statements in a number of cases to the effect that in a separate trial on the issue of sanity the defendant has the burden of proving insanity by a preponderance of the evidence. (*People* v. *McLachlan,* 13 Cal.2d 45, 55 [87 P.2d 825] ; *People* v. *French,* 12 Cal.2d 720, 734 [87 P.2d 1014] ; *People* v. *Troche,* 206 Cal. 35, 49 [273 P. 767] ; *People* v. *Hickman,* 204 Cal. 470, 477 [268 P. 909, 270 P. 1117].)'' (*People* v. *Hardy,* 33 Cal.2d 52, 65 [198 P.2d 865].) That is the more appropriate way to instruct the jury.

Defendant contends that the instructions on deliberation and intent were improper. The jury was instructed in the language of sections 187-189 of the Penal Code, as to manslaughter and the degrees of murder, and as to murder of the first degree. It was told that to constitute first degree murder the killing must be by torture as defined, or wilful act accompanied by malice together with a clear and deliberate intent to take life. It was told that the intent must be the result of deliberation and must be formed on preexisting reflection and not under heat of passion or such other condition as to preclude deliberation. ''The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. The true test is not the duration of time, but rather the extent of the reflection. Thoughts may follow each other with great rapidity and a cold, calculated judgment and decision may be arrived at quickly. However, the express requirement for a concurrence of deliberation and premeditation excludes from murder of the first degree those homicides not specifically enumerated in the statutes. To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and

against such a choice and, having in mind the consequences, decide to and commit the unlawful act causing death. . . .

"The adjective 'deliberate' means formed, arrived at or determined upon as a result of careful thought and weighing of considerations; as a deliberate judgment or plan; carried on coolly and steadily, according to a preconceived design; given to weighing facts and arguments with a view to a choice or decision; careful in considering the consequences of a step; unhurried; characterized by reflection; dispassionate; not rash. The word 'deliberate' is an antonym of 'hasty, impetuous, rash, impulsive.'

"The verb 'premeditate' means 'to think on, and revolve in the mind, beforehand; to contrive and design previously.'

"Thus, to find the defendant guilty of murder of the first degree, you must be satisfied beyond a reasonable doubt and to a moral certainty that the unlawful killing was accompanied with a deliberate and clear intention to take life. The intent to kill must be the result of deliberate premeditation; it must be formed upon a pre-existing reflection, and not upon a sudden heat of passion sufficient to preclude the idea of deliberation. It is necessary that the act of killing be preceded by a concurrence of will, deliberation and premeditation on the part of the slayer." Those instructions satisfy the requirements of the law as most recently stated by this court. (*People* v. *Carmen,* 36 Cal.2d 768, 777-778 [228 P.2d 281].)

The judgment and order denying a motion for a new trial are affirmed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Edmonds, J., concurred in the judgment.

Appellant's petition for a rehearing and modification was denied May 28, 1953.