[Crim. No. 3695. Third Dist. Nov. 18, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES W. BLALOCK, Defendant and Appellant.

L. Miles Snyder, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Raymond M. Momboisse, Edward A. Hinze, Jr., and Ronald W. Tochterman, Deputy Attorneys General, for Plaintiff and Respondent.

FRIEDMAN, J.—An indictment charged James Blalock and Melvin Eddings with robbing and murdering William Kiser on February 1, 1964. The same indictment charged Blalock alone with robbing Richard Kern on January 27, 1964. The jury found Blalock guilty of first degree murder and both robberies and acquitted Eddings of the two charges against him. Sentenced to life imprisonment, Blalock appeals.

Kiser's body, face down, was found in a lumber yard near Broadway and Front Streets in Sacramento on Sunday morning, February 2. The body was nude. Kiser's clothes were piled in a loose bundle near the body and his other belongings were strewn about, including a wristwatch (which was still running) and automobile keys. A 5-foot length of 2 x 4 lumber, broken in two pieces, was lying a few feet from the body. One of the pieces was blood-stained. Death had resulted from skull fractures with extensive brain damage. He had been struck three times with a blunt instrument, probably while he was lying in a horizontal position. Blows from the 2 x 4 lumber could have caused the injuries. Kiser had lived for approximately 30 minutes after the blows were struck. Various estimates place the time of death at some time between 9:30 p.m. the preceding night and 4 a.m. that morning. Blood tests indicated ingestion of alcohol prior to death.

Kiser usually wore an onyx ring with an Old English initial K. The ring was missing. The automobile keys near the body were found to fit a green Chevrolet which Kiser had been driving the preceding night. The car was found parked near the Los Amigos bar at 7th and Q Streets. Kiser's empty wallet and papers were found strewn on the street several blocks away. Although he had cashed a check for $25 on Saturday evening, there was no money in the wallet.

Detective Stanley of the Sacramento Police Department heard that Melvin Eddings, age 18, had been seen in the Los Amigos bar on Saturday night. Stanley interviewed Eddings on Monday, February 3, and Tuesday, February 4. Eddings identified Kiser's picture as that of a man with whom he had talked at the bar Saturday night. He did not give the police any other usable information during those two interviews.

One Joe Bold read newspaper accounts of the body's discovery. These included a description of Kiser's missing ring. On that very Saturday night Bold had come into possession of a ring answering that description, and its previous possessor had been his brother-in-law, James Blalock. Becoming worried, he asked Blalock where he had got the ring. Blalock told him several different stories. He said that he had received the ring from a man who rode with him to a bar called Polo's; that he took it from a person he had met a long time ago; that he had slapped somebody on the side of the head and had taken the ring. Bold's worries persisted and he persuaded Blalock to go with him to see a Catholic priest. Late Tuesday night, February 4, Bold, his wife and Blalock went to the priest. At about 12:30 a.m. several police officers came to the church rectory and conversed with Bold and the priest, while Blalock stayed in the waiting room.[1] The police requested Bold and Blalock to come to the police station with them. Mr. and Mrs. Bold rode in one police car, Blalock in another. The police did not question Blalock at the rectory or en route to the police station.

At the station there was a series of interrogations throughout the night. First Officer Viegas interviewed Blalock in one interrogation room, while Officers Stanley and Guerrero questioned Bold in another room. Viegas then left Blalock waiting alone for approximately a half hour, then, about 1:30 a.m., returned with Officer Stanley for further questioning. Blalock was informed of some of Bold's statements, but the extent of that information cannot be ascertained from the record. Then Blalock, left alone for several hours, slept on some chairs. About 4 o'clock a. m. a deputy district attorney arrived at the police station and took a recorded statement from Bold. Bold's statement implicated Eddings.

Officer Stanley went to Eddings' home early Wednesday morning. Eddings was not there and Stanley left a message

---

[1] The record does not show it, but it is inferable that the priest secured his visitors' permission before inviting the police.

that he was to come to the police station. In the meantime the deputy district attorney held a recorded interview with Blalock. This interview lasted about an hour, concluding at approximately 7:30 a.m. Eddings arrived at the station about an hour later. Eddings then participated in a recorded interview with the deputy district attorney. During the course of the interview, Bold was brought into the room and identified Eddings as a man who had driven with him and Blalock from the Los Amigos bar to Polo's bar on Saturday night. Bold was then permitted to go home. Blalock and Eddings were placed in formal custody about noon that day.

Bold's first discussion with the police at the rectory took place in Blalock's absence. Bold and Blalock were kept apart during the remainder of the night and during the next morning. Eddings and Bold were together only briefly, when Bold was brought in to identify him. At no time during the interrogations was Blalock or Eddings informed that he had a right to legal counsel or a right to remain silent.

The trial occupied more than 30 trial days and more than 2,500 pages of transcript. Police officers, investigators, criminologists and others were called to establish the fact of Kiser's death by criminal means. The evidence designed to pin the death on Blalock was of much smaller extent, consisting primarily of Joe Bold's testimony, Blalock's extrajudicial statement and Kiser's initial ring, with small assists from the testimony of Mrs. Kiser and a bartender.

Bold was called as a prosecution witness. He testified that he and Blalock had arrived at the Los Amigos bar in Blalock's car somewhere about 8:45 p.m. on Saturday evening, February 1. Blalock stopped to talk to someone in the bar area, while Bold went to the rear of the premises to watch a card game. Blalock joined him about five minutes later, told him he knew where he could get $400 and asked Bold if he wanted "in." Bold asked, "In what?" Blalock did not reply and returned to the bar area. Later Blalock returned, gave Bold the car keys and told him that if he did not return, Bold could leave without him. About 15 minutes later, Blalock was back again, asked for his keys, then left. After about 15 minutes Blalock returned and asked Bold if he was ready to go. They left the Los Amigos bar about 9:30 p.m. Outside the bar Blalock motioned to one of three men standing on the corner to accompany them. This man was later identified as Melvin Eddings. Bold noticed that Blalock's car had been moved from its original parking

place. The three entered the car, Blalock occupying the driver's seat, Bold sitting next to him and the man later identified as Eddings seated in the back. They drove toward Polo's bar, located in another part of the city. En route Blalock's driving became erratic, apparently because of intoxication. Bold had him stop and took over the wheel. During the course of the journey the man in the back seat of the car asked ''Why does an individual rip the clothes off a guy?'' Blalock replied, ''Any lug or thug does this to keep the guy from running out in the street. Anyway, where were you to help me?''

Continuing his testimony, Bold related that on arriving at Polo's they got out of the car. As they were crossing the street Blalock put his hand into his pocket, brought out an object and tossed it away. Bold picked it up. It was the ring which Bold later turned over to the officers. The third man did not enter Polo's bar with them. Bold and Blalock went into Polo's together.

Blalock's recorded extrajudicial statement was read to the jury after *voir dire* testimony to establish its voluntariness and after the court had instructed the jury that the statement was not to be considered relative to Eddings. Blalock said that he had met a Negro man about 25 years old at the Los Amigos on Saturday night. The man had a baby face and ''processed'' (i.e., straightened) hair, which hung over his face and a ''real keen little nose.'' Blalock had also seen a red-headed Negro woman at the bar who was talking to a sandy-haired white man, wearing a red shirt, black pants and a fatigue jacket.[2] The woman came over to the 25-year-old Negro and whispered that the white man had a lot of money on him, about $400, and that they were going to take the money. The Negro man then asked Blalock if he had an automobile. Blalock then went to Bold to see what he thought of the idea of taking money from the white man, but Bold wanted nothing to do with it. Blalock left Bold and returned to the bar, where the same Negro man suggested that they get narcotics. Blalock did not want any, but took a walk with the man to a house several blocks away, where the man talked to someone at the door. They then walked back to Los Amigos and stood outside in front of the bar. The man gave Blalock the ring (which later turned out to have been taken from the

[2]Kiser had been wearing a suit and white shirt on the night of his death.

murdered man). The man said the ring was too big for him. Blalock got Bold and they drove over to Polo's with the man who had given Blalock the ring. En route to Polo's they had a conversation about getting money and the man said, "If you catch a man, take—if you don't knock him out, take his clothes and he can't run and call the police."

Mrs. Kiser had last seen her husband earlier the evening of February 1. He was then wearing his initial ring. A bartender testified that he had seen Kiser at the Los Amigos twice during that evening. His estimates of time corresponded in a general way with those of Bold. The bartender had also seen Eddings in the Los Amigos that night. Blalock's defense consisted of the testimony of several witnesses who said that they had seen Kiser at the Los Amigos and other bars at times much later than those given by the prosecution witnesses. Blalock took the stand only for the purpose of denying the robbery of Kern.

Extrajudicial statements of Eddings, Blalock's codefendant, were admitted with an instruction that they were not to be considered against Blalock. The prosecution offered several of Eddings' extrajudicial statements. During interviews preceding his recorded statement of February 5, Eddings had said that he had been in the Los Amigos only for a short time and had then taken a bus to the Ace of Clubs, which is close to Polo's. On the morning of February 5, after Bold had identified Eddings as the man who had driven with him and Blalock on Saturday night, Eddings related a greatly expanded and markedly altered story to the police. Indeed, Officer Stanley testified that Eddings' new statement included much information that the authorities had not known. Eddings said that he had been evasive about Saturday night's happenings because of fear of being killed by "this man." He then gave a detailed statement to the police, which we summarize as follows: At the Los Amigos bar Eddings saw and talked to Kiser, who was drunk. Kiser complained that the people at the bar thought he was a cop because they were all colored and he was the only white person there. Kiser asked him where he could find some girls. Eddings suggested a likely neighborhood and Kiser asked him to come along. A man whom Eddings did not identify at the time of his statement offered to give them a ride. They drove to a nearby bar and Eddings got out, looked through the door, then returned to the car to report that he had not seen any women in there. Eddings opened the car door and

wanted Kiser to get out. In a drunken manner Kiser slumped over as if to get out when the driver of the car leaned over and grabbed the back of Kiser's collar. Eddings left Kiser with the driver of the car and walked back to Los Amigos. Later the driver of the car returned to Los Amigos and got Bold, then asked Eddings if he wanted a ride. On the way to Polo's the driver kept asking Eddings why the latter had refused to help him. Eddings had never robbed anybody and did not want to tell the driver he was scared so told him he just didn't want to do it. Eddings never saw a ring and did not see Blalock throw anything on the street near Polo's bar. He identified Blalock as the driver of the car. After arriving at Polo's Eddings left to go to the Ace of Clubs.

The evidence tying Blalock to the robbery of Kern consisted mainly of Kern's testimony. The latter stated that he had been in the Los Amigos on Monday, January 27, at approximately 8:30 p.m. A man whom he identified as Blalock approached him and offered to sell him a gun. Blalock first indicated that the gun was in his car, but when they reached the car Blalock told him he had guns in a place across the street. They crossed the street and walked into an alley. Blalock told Kern to wait and left. He returned two minutes later and pointed an object at Kern's stomach. Kern believed it was a knife. After tussling with Blalock and getting a cut on his arm, Kern decided to give up. Blalock made him lie down on his stomach, sat on his back while he took Kern's ring, watch, wallet and some money. Blalock then grabbed a brick and told Kern he was going to do something to quiet him. Kern urged Blalock not to hit him. The latter said he would have to do something to keep him quiet and ordered Kern to take off his clothes. Blalock then left, taking the clothes with him. Later Kern told others that he had been robbed. He reported to the police only that he had lost his wallet and money. The clothing was found the following day in the back yard of a home near the vicinity of the attack. As a result of the Kiser case, Blalock's picture appeared in the newspapers. Kern recognized him as the man who had robbed him.

We first consider Blalock's claim of prejudicial error in the admission of his extrajudicial statement. ▪ A defendant's extrajudicial statement to the police is inadmissible if it was obtained when ''(1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was

in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he waived these rights." (*People* v. *Dorado,* 62 Cal.2d 338, 353-354 [42 Cal.Rptr. 169, 398 P.2d 361]; *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977].)

The conditions outlined in *Dorado, supra,* were elaborated in *People* v. *Stewart,* 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97]. In that case the defendant had been explicitly arrested, jailed, subjected to daily interrogation and had confessed on the fifth day of interrogation. In the context of that situation the court stated that an investigation normally focuses on a particular suspect at the point of his arrest; that when (a) the officers have arrested the suspect and (b) subjected him to interrogation lending itself to eliciting incriminating statements, the accusatory stage has been reached and the suspect is entitled to counsel. The *Stewart* opinion did not ignore variant possibilities, pointing out that in some cases incrimination-directed questioning may occur before arrest; that arrest may be "the culmination, not the beginning, of police investigation." (*People* v. *Stewart, supra,* 62 Cal.2d at pp. 577-578.) Conversely, even after detention, questioning may be investigatory and not incrimination-directed (see *United States* v. *Konigsberg,* 336 F.2d 844, 853; *People* v. *Mickelson,* 59 Cal.2d 448, 450-451 [30 Cal.Rptr. 18, 380 P.2d 658]; *People* v. *Ford,* 234 Cal.App.2d 480, 486-492 [44 Cal.Rptr. 556]; *People* v. *Cully,* 236 Cal.App.2d 769, 773-778 [46 Cal.Rptr. 644]).

Although an arrest frequently signals a visible shift from investigation to accusation, this distinct shift is often absent. A criminal inquiry may range over broadly scattered leads, then narrow and intensify as evidence and deduction progressively focus on a point of suspicion. A cold investigation gets hot by degrees of warmth. The accusatory stage is not revealed full-blown but evolves imperceptibly. This gradual metamorphosis is particularly characteristic of criminal investigations in which the individual enters the police station for interview and never leaves it as a free man. Before not after arrest he becomes the focus of suspicion; in silence he loses his freedom to walk out of the station house, and custody becomes a fact without the formality of announced arrest; the accusatory stage emerges at some point preceding

this formality.[3] In order to rule on the admissibility of an extrajudicial statement elicited during this gradual development, the court must determine for itself whether the statement was made before or after the accusatory stage had emerged. To do so we use the litmus supplied by the Stewart opinion: ''The test which we have described does not propose a determination of the actual intent or subjective purpose of the police in undertaking the interrogations but a determination based upon the objective evidence. Whatever may be the subjective intent of the interrogators, we must . . . analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances.'' (*People* v. *Stewart, supra,* 62 Cal.2d at p. 579.)

In this case Blalock's formal arrest took place some hours following his recorded interrogation. Blalock and Bold rode with the police from the rectory to the police station in response to a request or invitation. At that point of time, Blalock was doubtless the object of deep police interest, yet the investigation had not progressed beyond the general inquiry stage. Blalock's recorded interrogation, admissibility of which is in issue here, took place five to six hours later. During that interval of time, the police had twice interviewed Bold. By the time Blalock's recorded interrogation started, the police knew or had reason to believe the following: (1) Kiser had been at the Los Amigos bar on the Saturday night of his death, as had Blalock, Bold and Eddings. (2) Blalock had driven away from the Los Amigos bar during the evening and had returned after an interval of time, parking his car at another location. (3) Kiser had left the Los Amigos on foot or in the automobile of another person because his car was found outside the bar the next day. (4) Blalock's query to Bold relative to the $400 betokened an apparent readiness to rob. (5) En route to Polo's bar he had described his method of stripping a victim to prevent pursuit. (6) In connection with the statement relative to stripping, he had asked the man in the back seat of the car why

---

[3]After preparation but before filing of this opinion, this court received a copy of the state Supreme Court's decision in *People* v. *Furnish,* 63 Cal.2d 511 [47 Cal.Rptr. 387, 407 P.2d 299], filed November 12, 1965. On this identical point, the opinion states: ''We are satisfied that, although an arrest ordinarily signals the advent of the accusatory stage, the fact of an arrest is not essential to the maturing of that stage.''

the latter had not helped him. (7) Kiser had been stripped. (8) Blalock had come into possession of Kiser's ring that same evening. (9) Of the several explanations he had given Bold, one was that he had taken the ring after he had "slapped somebody up aside the head."

With this knowledge Pollyanna herself would have viewed the suspect through narrowed lids. Suspicion had centered on him preceding his recorded interrogation. The same knowledge which made him the focus of suspicion demonstrates that he no longer had freedom to walk out of the police station. There had been no announced arrest, yet his custody was as palpable as that of a booked prisoner.[4] The recorded interrogation had yet to occur; it would simply buttress the information gained from Bold. The police would send for Melvin Eddings and question him too. Eddings would be implicated by his own altered and expanded statement. Yet, as regards the investigators' attitude toward Blalock, Eddings' statement would fortify an existing hypothesis of guilt. Blalock's recorded statement and Eddings' interview would not reveal Blalock as a suspect, but only build up the case against him.

The time consumed by the recorded interrogation of Blalock, slightly over an hour, is not particularly significant. It was the third of three parleys, the contents of the first two not being of record. Of greater significance is the character of the questioning. Having previously questioned Bold, the interrogator asked Blalock to explain his possession of Kiser's ring; then escorted him through a fanciful account of the evening's activity, an account which, by its apparent falsity rather than its apparent truth, tended to demonstrate guilt; suggested that he, Blalock, had turned up with the ring within minutes of its owner's death; asked him whether he had mentioned a method of taking the clothes off a victim. ▉ To describe the "total situation" in briefest terms, the interrogation lent itself to elicitation of incriminating statements from a suspect in police custody after the accusatory stage had been reached. There is no claim on the People's part that the police complied with the then unannounced *Dorado* rule by informing the suspect of his right

---

[4]At one point during the recorded interview, Blalock said that he had intended to report to a job that morning. The interrogator responded: "Well, you may not be able to show up for the job this morning, I am afraid, because Mr. Bold——." Blalock interrupted, stating "Well, that's OK," and the interrogator did not complete his statement.

to counsel. Consequently, admission of the statement in evidence was error.

 Subject to relatively rare exceptions, admission of a confession or admission elicited in violation of the *Dorado* rule requires reversal of the conviction without regard to independent evidence of guilt. (*People* v. *Jacobson*, 63 Cal.2d 319, 329-331 [46 Cal.Rptr. 515, 405 P.2d 555]; *People* v. *Schader*, 62 Cal.2d 716, 731 [44 Cal.Rptr. 193, 401 P.2d 665].)

 Blalock's statement to the police was not a confession or admission of crime. It was an assertion of innocence, however lame. While its evidentiary use was error, the error does not require reversal unless it caused a miscarriage of justice. (Cal. Const., art. VI, § 4½; *In re Spencer*, 63 Cal.2d 400, 407 [46 Cal.Rptr. 753, 406 P.2d 33]; *People* v. *Hillery*, 62 Cal.2d 692, 712 [44 Cal.Rptr. 30, 401 P.2d 382].)

 On its face Blalock's statement was exculpatory. Coupled with the other evidence against him, the statement strongly reinforced the prosecution's case. Its design, however feeble, was to shift suspicion to the man who rode in the back seat to Polo's bar. In acquitting Eddings the jury thoroughly rejected the statement and demonstrated its belief that Blalock had lied to the police. By revealing falsity and consciousness of guilt, the statement contributed to the jury's verdict. It strongly corroborated the other evidence of guilt. Independent evidence connecting Blalock with the Kiser robbery-murder was sparse and circumstantial. Essentially it consisted of Bold's testimony and of the ring itself.[5] Displaying enough wit to deny the crime, Blalock had insufficient wit to avoid the mechanical duplication of collateral details described by Bold. In detail after detail Blalock's story demonstrated Bold's veracity. The presence of the pair at the Los Amigos bar on the night of the crime, the discussion of a proposed $400 robbery, the encounter with a third man who eventually rode in the back seat of Blalock's car to Polo's, the conversation relative to stripping a victim, Blalock's acquisition of the ring on the night in question—at most of these points Blalock's statement differed from Bold's only in shifting the *dramatis personae* and embellishing them in fanciful disguise. As these successive features of Blalock's

---

[5]We do not overlook Eddings' statement which, if considered for that purpose, would have fortified much of Bold's testimony. The jurors however, had been instructed to disregard Eddings' extrajudicial statement in considering Blalock's guilt.

statement unfolded, the jurors must have been impressed with Bold's probity and the accuracy of corresponding features of the latter's testimony. Thus Blalock's "exculpatory" statement played a powerfully incriminating role in his trial. The introduction of this statement was "so damaging to defendant that we cannot say that . . . [it] caused only harmless error under article VI, section 4½ of the California Constitution." (*People* v. *Anderson*, 63 Cal.2d 351, 362 [46 Cal.Rptr. 763, 406 P.2d 43]; see also *Fahy* v. *Connecticut*, 375 U.S. 85, 91 [84 S.Ct. 229, 11 L.Ed.2d 171]; *People* v. *Jacobson, supra*, 63 Cal.2d at pp. 330-331; *People* v. *Cotter*, 63 Cal.2d 386, 398 [46 Cal.Rptr. 622, 405 P.2d 862]; *In re Spencer*, 63 Cal.2d 400, 407-408 [46 Cal.Rptr. 753, 406 P.2d 33]; *People* v. *Mathis*, 63 Cal.2d 416, 434 [46 Cal.Rptr. 785, 406 P.2d 65]; *People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243].)

The judgment of conviction of the robbery and murder of Kiser must thus be reversed. Other attacks on the same conviction are not likely to occur on retrial and need not be discussed.

Two errors are assigned as grounds for reversing Blalock's conviction of the Kern robbery. First of these is the claim of abuse of discretion when the trial court denied a defense motion for Blalock's separate trial on the charge of robbing Kern.

The two robbery charges against Blalock, although involving different victims, could be consolidated in a single indictment and trial because both were of the same class of crimes. (Pen. Code, § 954.) Statutory permission to consolidate does not supply a complete answer, for section 954 gives the trial court discretionary power to order separate trials in the interests of justice. Refusal of severance may be prejudicial error if discretion is abused. (*People* v. *Winston*, 46 Cal.2d 151, 158 [293 P.2d 40].) Recognizing the discretionary power of the trial court, counsel for Blalock urges an abuse of discretion. A considerable portion of the trial time was occupied by proceedings outside the jury's presence. Of approximately 16 days of testimony before the jury, 14½ were spent on the Kiser murder-robbery and only 1½ days on the Kern robbery. The thesis is that evidence of the brutal robbery and slaying of Kiser inflamed the jury, overwhelming any reasonable doubt of Blalock's guilt of the Kern robbery in a mass of circumstantial evidence directed solely at the Kiser case.

■ Evidence that in committing other offenses a defendant used a *modus operandi* or characteristic criminal method tends to prove his commission of the crime at bar and is admissible for that purpose. (*People* v. *Cavanaugh,* 44 Cal. 2d 252, 265-266 [282 P.2d 53] ; *People* v. *Chambers,* 231 Cal. App.2d 23, 31 [41 Cal.Rptr. 551].) ■ ■ Thus, in a separate trial upon a charge of robbing either victim, the prosecution could show that Blalock had forced the other victim to lie on the ground and had stripped him too of clothing.[6] Although there was a risk that the probative value of such evidence might be outweighed by its prejudicial impact, evaluation of that risk rested in the sound discretion of the trial court. (*People* v. *Henderson,* 60 Cal.2d 482, 495 [35 Cal.Rptr. 77, 386 P.2d 677].) Thus, the death of one of the victims did not bar evidence of the *modus operandi* used in robbing that victim.

In weighing its discretionary power to order separate trials, the trial court could consider this interplay of evidence between the two occurrences. Whether there was consolidation or severance, this interplay would occur. In either event, the jury's ability to weigh the question of guilt objectively without drawing venom from knowledge of the defendant's criminal proclivities would depend upon effective instructions. (See *People* v. *Chambers, supra,* 231 Cal.App.2d at pp. 31-34.) There is no claim of inadequate instructions. Even though the trial judge might have ordered severance, we cannot say that he abused his discretion in denying it.

■ There is a claim of prejudicial error in an evidentiary ruling. The circumstances of the Kern robbery and his delay in reporting it permitted a speculation that Kern might have gone into the dark alley with Blalock for homosexual conduct. Cross-examining Kern in an attempt to show bias, Blalock's trial counsel sought to elicit admissions that the witness had been arrested or charged with sexual misconduct in the Navy. The court sustained prosecution objections. Later, defense counsel repeatedly and without objection asked Kern if he had gone into the alley with Bla-

---

[6]Blalock's formal conviction of that other offense is not a prerequisite to proof of it. (*People* v. *Griffin,* 60 Cal.2d 182, 190 [32 Cal.Rptr. 24, 383 P.2d 432], reversed on other grounds, 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106].) That we here reverse the Kiser murder-robbery conviction does not retroactively affect that offense as a factor in the problem of trial severance.

lock or had taken off his clothes for an illicit purpose. The witness denied any such purpose. The earlier ruling, foreclosing inquiry into the supposed Navy incident, is assigned as error.

The ruling was correct. Counsel could and was permitted to probe for bias arising from a desire to conceal improper sexual motivations involving the very event for which the defendant was on trial. When rebuffed by the trial court's ruling, he was not probing into that event but into the witness' past. ▮ Code of Civil Procedure section 2051 prevents impeachment of a witness by evidence of particular acts, with the single exception that a felony conviction may be shown. Counsel was not attempting to show a felony conviction, but asked only if the witness had been charged or arrested for the offense. Such an inquiry is improper. (See *People* v. *Pilgrim,* 160 Cal.App.2d 528, 530 [325 P.2d 143] ; Witkin, Cal. Evidence (1958) pp. 696-698.) ▮ There is a restricted class of situations in which inquiry into past sexual behavior is permitted for purposes other than impeachment. (See *People* v. *Pantages,* 212 Cal. 237, 262 [297 P. 890] ; *People* v. *Hurlburt,* 166 Cal.App.2d 334, 339 [333 P.2d 82, 75 A.L.R.2d 500].) The present case is outside that class.

The judgment of conviction of robbery and murder of William Kiser is reversed. The judgment of conviction of robbing Richard Kern is affirmed.

Pierce, P. J., and Warne, J. pro tem.,* concurred.

A petition for a rehearing was denied December 9, 1965, and respondent's petition for a hearing by the Supreme Court was denied January 12, 1966. McComb, J., and Mosk, J., were of the opinion that the petition should be granted.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.