[Crim. No. 11658.    Second Dist., Div. One.    Feb. 13, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. GILBERT PACHECO, Defendant and Appellant.

George G. Walker for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Charles R. Kocher, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—A jury convicted defendant of three counts of first degree burglary, three counts of assault with intent to commit rape, and three counts of assault with a deadly weapon. Probation was denied, and defendant was sentenced to the state prison—the terms imposed on two of the burglary counts were ordered to be served consecutively, and the terms on the remaining counts, concurrently. He appeals from the judgment.

There are 16 assignments of error. In addition to the asserted insufficiency of the evidence to support the finding of guilt as to each count and the inadmissibility of items of evidence received against him, defendant challenges the validity of certain procedures taken during the pendency of the trial and thereafter. As to this latter claim, the record reveals the following: After the entry of his plea, defendant moved that the criminal proceedings be suspended until an examination was had to determine his sanity (Pen. Code, §§ 1367, 1368) ; having been found after such examination to be then presently sane, the criminal proceedings were ordered resumed, thereafter

defendant was allowed to enter an additional plea of not guilty by reason of insanity. After the motion for new trial was denied, defendant's motion to withdraw this additional plea was granted when he personally stated that he preferred to stand on his petition, filed the previous day, that he be certified as "a mentally disordered sex offender" (Welf. & Inst. Code, § 5500 et seq.). Defendant having been committed to a state hospital for observation under the appropriate statute, criminal proceedings were thereafter resumed upon receipt of the required communication from the hospital's medical director (Welf. & Inst. Code, § 5512). Probation having been denied, defendant was then sentenced to the state prison.

In light of defendant's claim of the insufficiency of proof that he committed the offenses charged, we summarize the evidence adduced at the trial. The victims of the felonies charged in the indictment were three women residing in the Montecito area of Santa Barbara. The first of these women, Mrs. J. P., was awakened at about 2:15 on the morning of June 2, 1964, by a man who had apparently jumped onto her bed. When she retired, about four hours earlier, the doors to her apartment were locked. The man stabbed her in the face with some sort of object, telling her that he had a knife. (Later she felt the instrument which she assumed was a screwdriver.) He also told her that he would kill her if she did not remain quiet and remove her pajamas. There was a struggle, and the man practically smothered her to prevent her screams. He demanded that she put her hands on his exposed body, threatening to stick the instrument in her throat if she did not comply. Eventually his private parts touched hers, but there was no penetration. When she continued to scream, the man ran away. There was sufficient lighting from a flood light located just outside the bedroom window that she got a good look at the man; at the trial she identified defendant as her assailant.

Following the man's departure, the victim's purse and its contents were missing. When the police were called, an officer examined the apartment and its surroundings. Scuff marks were found on the wooden fence surrounding the patio; plants were beaten down as though somebody had jumped over the fence; there was a tennis shoe footprint in an area of wet dirt; the sliding glass door (on which there were smudges) and screen appeared to have been forced open. Later a police technician removed a partial palm print from the glass door and photographed certain footprints.

The second victim, Mrs. A. W., retired early on the morn-

ing of June 20, 1964. She was later awakened by a man who was on top of her and held a screwdriver at her throat. He told her: "Don't scream or I'll kill you." Mrs. W. struggled with the man; when he lifted the bed covers and put his hand on her leg, she pleaded with him. After he asked her where she kept her wallet, he put his hand on her chest; when she swore at him, he left. Although she did not get a good look at the man, she observed that he was big and strong with thick hair and a soft-spoken voice. After his departure, the victim discovered that the kitchen sliding glass door and screen were open; also open were the window and screen in her small son's room. When the police were summoned, footprints (some of them corrugated) were found under the kitchen and bathroom windows as well as on and below the rear fence. Certain of these footprints were later photographed by a police technician.

The third victim, Mrs. M. W., was awakened early on the morning of June 23, 1964, by a man approaching her bed. When she screamed, the man told her that he had a knife and would run it through her throat if she did not remain quiet. (Later she determined that the instrument was a screwdriver.) After he unbuttoned his trousers, he demanded that she touch his private parts; he also attempted, but did not accomplish penetration. After he left, the victim discovered that her purse and some money were missing. There was a night light in the victim's bedroom, and she was able to observe her assailant's appearance. She picked him out at a police lineup and identified him at the trial.

As in the instance of the other victims, footprints were observed by police outside the apartment; there was also a smudged footprint on a bedsheet. They were photographed, and the bedsheet was taken into possession by the police.

Evidence of offenses not charged in the indictment was received. In an early mid-August morning of 1964 a Mrs. V., likewise residing in Montecito, was aroused from her sleep by a man who put something over her face and an arm over her throat. After fighting with the man, she was able to reach a gun in a box beside her bed. After telling her that he would leave if she did not shoot, the man departed. Later a screwdriver was found beneath the bed. There was sufficient lighting in the room that Mrs. V. was able to identify defendant at the trial. Earlier, in late January of 1963, a Mrs. S., residing in San Jose, was molested by an intruder who awakened her at about 2 a.m. Holding a sharp instrument at her throat, he com-

pelled her to take off the bottom of her pajamas and then got into her bed. Penetration was accomplished. Later, after fastening his trousers, the man took the victim's purse and its contents. She was able to observe his silhouette; she also noted that he had a soft voice. Having ascertained that entrance to her apartment was obtained through a bedroom window, the police found and lifted palm prints from the inside window sill. These prints were sent to a state agency in Sacramento where a comparison was made of prints obtained from defendant. There was testimony that the palm prints lifted from Mrs. S's window sill had been made by defendant.

The following circumstances led to defendant's arrest: Late in the evening of August 21, 1964, Detective Strong was on stake-out duty in the rear of a house on Palm Tree Lane which, in turn, is adjacent to the apartment occupied by Mrs. P. (the first of defendant's victims) in the Montecito area. He saw a man carrying a flashlight with a red rim around the lens; although the man was told by Strong that he was a police officer and ordered to stop, he sprang to the top of a fence. After again being informed by Strong that he was a police officer and ordered to halt, the man jumped from the fence and Strong fired one shot. Patrolman Reid, who was in the immediate neighborhood, heard noises and lights from the area just mentioned; he also heard a shout: "Stop that man, he is a burglar." After Reid positioned himself and drew his weapon, he saw a man in the beam of his flashlight. Reid ordered the man to halt; when the latter complied, he dropped a flashlight he was carrying. Reid was able to identify the man as defendant. Suddenly defendant sprinted away from Reid who fired two shots, one toward defendant's legs. Later that evening the police found a car parked on Palm Tree Lane; there was evidence that it belonged to defendant's mother and was occasionally used by him. Shortly after midnight, the police proceeded to 310 South Canada Drive to investigate reports of a prowler; the above address, it developed, was where defendant resided along with his parents. He was found on a rear porch in his stocking feet and appeared to have a bullet wound in his right leg. An ambulance was called and defendant taken to a hospital. Bloody footprints were subsequently observed in the driveway of the Canada address and on the steps to the porch.

Thereafter the following incriminating evidence was secured: With the consent of defendant's mother, a search was made of defendant's bedroom; a pair of rippled soled shoes was found and taken into possession. Thereafter the police

went to the hospital; there they took into possession a bloody sock and several articles of clothing. Later blood trails were found near Mrs. P's apartment; also found was a pair of tennis shoes with diamond patterned soles, the right one of which was soaked with blood. Testimony was given by a police technician, not only as to the similarity of palm prints taken from Mrs. P's sliding glass door and those of defendant, but also of the footprints along the blood trail, just mentioned, and the areas around Mrs. A. W.'s residence, made either by the tennis shoes belonging to defendant or the shoes taken from defendant's residence.

Defendant did not testify. With certain exceptions, the only defense testimony appears to have been introduced in an effort to establish an alibi.

The first assignment of error challenges the sufficiency of the evidence to support the jury's verdict; specifically, the proof is said to be insufficient as a matter of law. Singled out are items of the victims' testimony, particularly as to the identity of their assailant, which assertedly are at variance with his participation in the incidents complained of. Defendant also attacks the credibility of expert testimony regarding his footprints and the several points of similarity noted by the fingerprint expert. ■ There is no merit to this line of argument, since ''The rule is firmly established that before a judgment can be set aside on the ground of the insufficiency of the evidence it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below.'' (*People* v. *Alonzo*, 158 Cal.App.2d 45, 47 [322 P.2d 42].) ■ It is also the law that unless the identification of a defendant by the victim of a crime is inherently improbable or incredible as a matter of law, a jury's verdict based thereon cannot be properly set aside by an appellate court. (*People* v. *McLaine*, 204 Cal.App.2d 96, 104 [22 Cal.Rptr. 72].) ■ Accordingly, in the present case the verdict is supported by the following reasonable hypotheses: Each victim named in the indictment was able to identify defendant, either visually or by his voice; each was threatened by a srewdriver, all victims so testifying; the circumstances of each offense were similar in several respects, entry to a private residence in the very late evening or early hours of the morning by an intruder who intended sexual assault. Too, there was a definite behavior pattern in defendant's criminal *modus operandi*; this is established by the San Jose victim who positively identified defendant as her assail-

ant, and her testimony was, of course, admissible for that purpose. (*People* v. *Blalock*, 238 Cal.App.2d 209 [47 Cal.Rptr. 604].) Finally, it should be noted that defendant sustained gunshot wounds, after refusing to halt, while in the vicinity of the residence of at least one of his victims. The evidence, both circumstantial and direct, was neither incredible nor improbable; it was believed by the trier of fact and is substantially sufficient to warrant appellate approval.

Error is urged with respect to the receipt in evidence of several exhibits offered by the People. The first three were maps used by a police officer to illustrate his testimony. Preliminarily, the use of maps for the above purpose has been sanctioned (*People* v. *Kynette*, 15 Cal.2d 731, 757 [104 P.2d 794]), and the proper foundation is laid, as in the case of films or photographs, by a showing that they represent what they purport to show. (Cf. *People* v. *Bowley*, 59 Cal.2d 855, 859 [31 Cal.Rptr. 471, 382 P.2d 591, 96 A.L.R.2d 1178].) The first map (Exh. 37) depicted a blood trail followed by the witness; after *voir dire* examination by defense counsel, his objection was withdrawn. The next drawing (Exh. 48) related to the general area where certain of the offenses were committed; it was received in evidence without objection. The third map (Exh. 42) depicted the area near defendant's home, illustrating another blood trail followed by the witness and the location of defendant's tennis shoes. There was *voir dire* examination by both sides before the exhibit was received. We cannot say that the trial court abused its discretion in determining that a sufficient foundation had been laid for this third exhibit's admission. Seven additional exhibits, being articles of defendant's clothing obtained by the police at the hospital, were likewise admitted; and it is now contended that they were obtained by means of an illegal search and seizure. The objection comes too late, since there was no objection at the trial to their admission on such grounds. ''A failure to object to the introduction of evidence which defendant alleges was illegally obtained precludes the successful presentation of the issue at the appellate level.'' (*People* v. *Hyde*, 51 Cal.2d 152, 157 [331 P.2d 42].)

Citing *Malloy* v. *Hogan*, 378 U.S. 1 [12 L.Ed.2d 653, 84 S.Ct. 1489], appellant challenges the constitutionality of sections 1367 and 1368, Penal Code, the provisions of which were invoked by him prior to the criminal trial; he says they contravene the Fifth Amendment privilege against self-incrimination which is applicable to the states through the due process clause of the Fourteenth Amendment. Defendant was

examined by court-appointed psychiatrists without any offer of counsel or warning on self-incrimination; too, the record appears to be silent with respect to any waiver of defendant's Fifth Amendment rights. Similar constitutional questions were raised in *In re Spencer,* 63 Cal.2d 400 [46 Cal.Rptr. 753, 406 P.2d 33], where the court took note of the holding in *Malloy* v. *Hogan, supra,* and held that the introduction at the guilt phase of the trial of a defendant's statements to a court-appointed psychiatrist does not offend against the constitutional right against self-incrimination. In the present case, it appears that none of the statements made to the psychiatrists were received in evidence at the trial which commenced more than one month after the final proceeding under sections 1367 and 1368. That being so, and in view of the determinations made in *Spencer* (which, according to defendant, is not controlling), there is accordingly no merit to the instant claim.

Since defendant voluntarily withdrew his pleas of not guilty by reason of insanity, there is likewise no merit to the next contention that he did not intelligently and voluntarily waive his right to a jury trial as to such issue. The record fully supports respondent's position that the withdrawal of the subject pleas was personally consented to by defendant in open court with his counsel present after due inquiry by the court as to his desires in the premises. Under the circumstances just mentioned, any discussion of defendant's further claim that section 1026 of the Penal Code, relating to pleas of insanity and the presumption of sanity by a person so pleading is unconstitutional, becomes unnecessary. In passing we note, however, that the constitutional infirmity assertedly infecting section 1026 lies in its requirement that insanity must be established by a preponderance of the evidence; but it has been held that it is not unconstitutional to put a criminal defendant to a greater burden, namely, the establishment of his insanity beyond a reasonable doubt. (*Leland* v. *Oregon,* 343 U.S. 790 [96 L.Ed. 1302, 72 S.Ct. 1002].)

It is urged that a police officer's testimony during the present sanity proceeding under section 1367-1368 of the Penal Code violated the constitutional rules set forth in *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal. Rptr. 169, 398 P.2d 361]. Without objection the officer was permitted to testify as to an exculpatory statement by defendant explaining the wound in his ankle which, according to defendant, was sustained under circumstances different from those

given by prosecution witnesses. Relying on *People* v. *Fields*, 62 Cal.2d 538 [42 Cal.Rptr. 833, 399 P.2d 369, 16 A.L.R.3d 708], defendant argues that the sanity proceeding is part and parcel of the whole case against him because it is held in *Fields* that the determination of sanity, after which the court proceeds with the criminal charge (Pen. Code, § 1370), may be reviewed on appeal from the judgment of conviction (p. 541). The instant claims must be viewed in light of the following chronology: The present sanity proceeding was concluded on January 15, 1965, and since such termination antedates June 13, 1966, *Miranda* is inapplicable (*Johnson* v. *New Jersey*, 384 U.S. 719, 733 [16 L.Ed.2d 882, 892, 86 S.Ct. 1772]); *Dorado*, however, was decided on January 29, 1965, and the situation as to retroactivity is otherwise (*People* v. *Doherty*, 67 Cal.2d 9, 14-15 [59 Cal.Rptr. 857, 429 P.2d 177]); on February 16, 1965, the criminal trial resumed and the officer's statements were excluded at a session thereafter following objection by defendant's counsel citing the *Dorado* decision; thereafter no effort was made to seek a reconsideration of the prior determination of sanity under sections 1367 and 1368. The Attorney General argues that under all the above circumstances there was a waiver of any right to invoke *Dorado*, particularly since the question here posed relates not to defendant's guilt but to the issue as to whether he was then presently sane; *Fields*, however, holds that we must consider such determination of present sanity upon appeal from the judgment. Upon examination of the challenged testimony we cannot see grounds for defendant's claim of reversible error. The testimony challenged was that of a layman; it did not bear in great measure upon the problem of whether defendant had " ' ' "reasoning capacity sufficient to distinguish between right and wrong as to the particular act he is doing, knowledge and consciousness that what he is doing is wrong and criminal and will subject him to punishment." . . .' " (*People* v. *Daugherty*, 40 Cal.2d 876, 894 [256 P.2d 911].) The above seems to be the test for the court's resolution under present sanity proceedings. (§§ 1367-1368, Pen. Code.) Certainly it cannot be said that such testimony could have substantially influenced the court in reaching its determination in the special proceeding under consideration. If the finding had been as to the issue of guilt, defendant would have had to show a reasonable possibility that the evidence contributed to his conviction. (*Chapman* v. *California*, 386 U.S. 18, 22-24 [17 L.Ed.2d 705, 709-710, 87 S.Ct. 824].)

■ There is no merit to the claim that error was committed in the admission of evidence of other crimes not charged in the indictment. One exception to the general rule against admissibility of such crimes is found in situations where the *modus operandi* is similar (*People* v. *Lindsay,* 227 Cal.App.2d 482, 504 [38 Cal.Rptr. 755]) and to resolve the disputed issue of identity. Such similarity has heretofore been noted and need not be further discussed. The question of admissibility being for the trial court, there were ample grounds for its ruling admitting such evidence; too, the jury was twice instructed as to the limited purpose thereof.

■ Additional assignments of error involving the admission of evidence relate to (1) defendant's palm prints, (2) the prior consistent identification of defendant at a police lineup, and (3) a flashlight and screwdriver. As to (1) and (3), the evidentiary items were admitted without objection and the objection comes too late. (*People* v. *Saldana,* 233 Cal. App.2d 24, 33 [43 Cal.Rptr. 312].) ■ As to (2), the procedure criticized is in accord with accepted trial practice. (*People* v. *Gould,* 54 Cal.2d 621, 626 [7 Cal.Rptr. 273, 354 P.2d 865].)

■ Since he was charged with sex offenses, defendant complains that the court should have given a cautionary instruction, on its own motion, regarding the ease with which such accusations are made and the difficulty confronting the defendant to disprove the same. In *People* v. *Nye,* 38 Cal.2d 34 [237 P.2d 1], the court points out that the subject instruction should be given where the victim's testimony is uncorroborated; here, however, there were several victims who gave direct testimony, and there was considerable circumstantial evidence of an incriminating nature. The point is, accordingly, not sustainable. Further on the matter of the court's instructions, it is contended that the instruction relating to defendant's failure to testify was inadequate; upon a reading of this section of the court's charge, we are not persuaded that there is any validity to the instant claim.

■ There is no merit to the next contention that the court erred in certifying defendant for hearing and examination to determine whether he was a sex offender. In this connection he challenges the constitutionality of legislation pertaining to sexual psycopaths. (Welf. & Inst. Code, § 5500 et seq.) But defendant was sentenced to state prison, and not committed as a mentally disordered sex offender, and hence has no standing to assert the constitutional claims just mentioned.

We have examined the remaining contentions, one of which urges that the court should have submitted his pleas of not guilty to the jury in the trial on the guilt issue; the other involved the reading by certain jurors of newspaper accounts of the trial. With respect to the latter, the court subsequently instructed the jury to the expressed satisfaction of defense counsel; as to the former, it is patently without merit and requires no discussion.

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied February 23, 1968.