Filed 1/27/15  P. v. Pimental CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064831 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD246994) |
| WILLIAM ROBERT PIMENTAL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Robert F. O'Neill, Judge.  Affirmed.

Patrick J. Hennessey, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette and Julie L Garland, Assistant Attorneys General, William M. Wood and Brendon W. Marshall, Deputy Attorneys General for the Plaintiff and Respondent.

A jury convicted William Robert Pimental of active participation in a criminal street gang (Pen. Code,[1] § 186.22, subd. (a); count 1); assault by means likely to produce great bodily injury (§ 245, subd. (a)(4); count 2); and assault with a deadly weapon (§ 245, subd. (a)(1); count 3). It found true allegations that Pimental committed counts 2 and 3 for the benefit of, at the direction of, or in association with a criminal street gang. (§ 186.22, subd. (b)(1).) The court sentenced Pimental to 16 years in prison.

Pimental contends: (1) there was insufficient evidence to support his convictions and the true findings on the allegations; (2) there was insufficient evidence to support instructing the jury with CALCRIM No. 372 as to flight; and (3) the court erroneously instructed the jury on aider and abettor liability and the natural and probable consequences doctrine. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Betty Edwards testified that on March 25, 2013, she was driving past the Encanto trolley station in San Diego when she saw two young men, later identified as Raphael Castro and John Sanchez from the Encanto gang, trying to "jump" another young man, Pedro Arellano, from the rival Shelltown gang. Edwards told the attackers to leave Arellano alone, but they did not heed her. Several other young males also attacked Arellano. After that first attack, Castro and Sanchez briefly talked to Pimental—who was older and had just gotten off the trolley—telling him that a rival gang member had "fucked up one of their homies." Pimental replied, "Go get him." Castro and Sanchez

---

[1] Statutory references are to the Penal Code unless otherwise stated.

responded by chasing Arellano. Pimental ran alongside them. During the incident, Edwards heard the participants shout "Encanto" and "Shelltown." Sanchez was charged with stabbing Arellano approximately four times.

Arellano testified he previously had associated with the Shelltown gang. He remembered that during the fight, Pimental intervened on his behalf, telling one of the attackers, "Stop. Get off of him," and pulling an attacker from Arellano.

Edwards testified that during the stabbing incident, Pimental was nearby in the Encanto trolley station parking lot. Afterwards, Pimental told Castro and Sanchez that the two of them needed to leave the scene. Pimental tried to leave on the trolley but did not do so because Arellano had boarded that trolley.

After the incident, Edwards told Pimental that he was going to jail. He told her, "Bitch, shut up. These are my little homies. Stay out of it. I told them to do it." A female showed up and told Pimental, "Well they told me to come down here and get you." Pimental told her that he needed a ride to get away from the crime scene, and Pimental and the female left together, behind Castro and Sanchez, with whom they reunited soon afterwards.

Kimberley Johnson testified generally in accord with Edwards's testimony. Johnson identified Pimental as an older male who had yelled, "69," while encouraging Sanchez and Castro during the incident.[2] She added that she and another woman at the

---

2    A police officer testified that the Encanto criminal street gang claims the number 69 as their symbol because 69th Street runs through the Encanto neighborhood.

3

scene asked Pimental why he had not told Sanchez and Carter to stop attacking Arellano, but Pimental told them to shut up.

Juanita Rodriguez was at the trolley station and telephoned 911 to report the stabbing that she had seen. She testified at trial that during the fight, individuals yelled out "Shelltown" and "Encanto."

San Diego Police Department Officer Michael Barrett responded to the trolley station shortly after the incident and apprehended Castro and Sanchez nearby. Police also apprehended Pimental in the vicinity minutes later. In a postarrest interview with San Diego Police Department Detective Damon Sherman, who testified as a gang expert, Pimental admitted he was present at the crime scene, knew Castro and Sanchez, and knew that Arellano belonged to a different gang. Pimental admitted seeing one of the attackers armed with a knife before the stabbing. Pimental explained why he did not stop the fight: "If I were to, you know, even hold my little homies from proceeding in this activity, that there might be a possible consequence . . . 'for I.' " Pimental told the detective that Sanchez and Castro were energized as he was telling them, "Hey man, you guys, go." After the incident, Pimental told Sanchez and Castro that he did not want them to get locked up, and that the police were coming.

Detective Sherman testified at length about the history, composition and activities of the Encanto and Shelltown gangs. He stated that within gangs, younger members respect and try to impress more experienced older members. He testified regarding the importance of gang members backing each other up during fights, and the negative impact on their standing in the gang if they failed to do so. Detective Sherman identified

4

three predicate crimes committed by members of the Encanto gang. He also testified regarding the individuals involved in the incident, based on surveillance videos, which were played for the jury. The detective testified Pimental was a member of the Encanto gang based on Pimental's own admission, his association with gang members, and his gang tattoos. Detective Sherman testified the attack on Arellano was gang related in part because it occurred within the Encanto gang territory, and gang names were shouted during the incident.

## DISCUSSION

### I.

Pimental contends insufficient evidence supported his assault conviction because the incident began before he arrived at the trolley station. He argues: "The only testimony remotely suggesting [he] had any part was that of the two witnesses, Johnson and Rodriguez that they 'felt' [he] might have been encouraging the assailants. This was contrary to the explanation [he] offered investigating officers."

Pimental incorrectly interprets the standard of review for a claim of insufficient evidence, as we are not limited to considering testimony favorable to him; rather, we review the entire record. "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) It is the exclusive province of the jury to determine the credibility of witnesses or how much weight to give to their testimony. (*People v. Barnes* (1986) 42 Cal.3d 284, 303; *People v. Mayberry* (1975) 15 Cal.3d 143, 150.) Therefore, if the verdict is supported by evidence that is "reasonable in nature, credible and of solid value"

5

then we must defer to the trier of fact and not substitute our own evaluation of the merits, credibility, or weight of their testimony. (*Barnes, supra,* at pp. 303-304.) We presume in support of the judgment the existence of every fact the trier of fact could have reasonably deduced from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) The reversal of a conviction is only appropriate on grounds of insufficient evidence when "upon no hypothesis whatever is there sufficient substantial evidence to support it." (*People v. Redmond* (1969) 71 Cal.2d 745, 755; *People v. Daugherty* (1953) 40 Cal.2d 876, 885.)

Here, we conclude sufficient evidence supports the assault convictions. Edwards and Johnson testified that Pimental had encouraged Sanchez and Castro to retaliate against Arellano. Pimental ran alongside the two as they proceeded to attack Arellano a second time. Afterwards, when the two women confronted Pimental about his failure to stop the attack, he claimed he had directed Sanchez and Castro to undertake the attack. Pimental subsequently admitted to Detective Sherman that he had told Sanchez and Castro, "Hey man, you guys, go," noting they were energized. Pimental also knew before the stabbing that Sanchez had a knife. In light of that evidence and the gang expert's testimony regarding the hierarchy within the Encanto gang, the way in which younger gang members look up to older members, and the fact that gang members are expected to back each other up and not abandon one another, it was significant that Pimental admitted to the gang expert that he did nothing to stop the attack because he feared adverse consequences for himself if he had done so.

6

II.

Pimental contends there was insufficient evidence he participated in the assault with the intent to promote, further, or assist in any criminal conduct by gang members for the benefit of a criminal street gang: "The assault was undertaken before [Pimental] arrived. While gang names were shouted by the others, [Pimental] said he had no knowledge of any gang rivalries between the Shelltown and Encanto gangs. . . . Whether the assault was gang related as to either Sanchez or Castro does not suggest [Pimental's] mere presence at the scene evidenced the specific intent that the assault was to enhance their gang."

To establish a gang enhancement, the prosecution must prove two elements: (1) that the crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang," and (2) that the defendant had "the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) The crime must be "gang related." (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*); *People v. Gardeley* (1997) 14 Cal.4th 605, 622, 625, fn. 12 (*Gardeley*); *People v. Castenada* (2000) 23 Cal.4th 743, 745; *People v. Mendez* (2010) 188 Cal.App.4th 47, 56.) "Not every crime committed by gang members is related to a gang." (*Albillar,* at p. 60.) A defendant's mere membership in the gang does not suffice to establish the gang enhancement. (*Gardeley,* at pp. 623-624; *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199.) Rather, " '[t]he crime itself must have some connection with the activities of a gang . . . .' " (*Frank S.,* at p. 1199; accord, *People v. Martinez* (2004) 116 Cal.App.4th 753, 762 [§ 186.30 context].)

7

The prosecution must also prove "that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting two or more of the enumerated offenses (the so-called 'predicate offenses') during the statutorily defined period." (*Gardeley, supra,* 14 Cal.4th at p. 617, italics omitted.)  Pimental does not challenge the evidence concerning these last three elements, and thus implicitly concedes the sufficiency of the evidence supporting them.

"[T]o prove the elements of the criminal street gang enhancement, the prosecution may . . . present expert testimony on criminal street gangs." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047-1048; *People v. Ferraez* (2003) 112 Cal.App.4th 925, 930 ["It is well settled that expert testimony about gang culture and habits is the type of evidence a jury may rely on to reach a . . . finding on a gang allegation."].)  The expert's testimony must be accompanied by some substantive factual evidentiary basis from which the jury could reasonably infer the crime was gang related.  (*People v. Ramon* (2009) 175 Cal.App.4th 843, 852; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198; *Ferraez,* at p. 931.)

A.  *First Element*

As we have explained, the first element of the gang enhancement may be satisfied by any one of three prongs, that is, the crime was committed for the benefit of, at the

direction of, or in association with a criminal street gang. (§ 186.22, subd. (b)(1).) Pimental contends the evidence is insufficient to sustain this element because all it showed was his mere presence at the crime scene. As set forth fully above, Pimental's involvement in the crime was more extensive than he claims. Knowing the incident involved a rival gang member and that Sanchez had a knife, he nonetheless encouraged Sanchez and Castro to attack Arellano. He later told them to leave the crime scene before the police arrived. From this evidence, a jury could reasonably infer Pimental acted in association with the Encanto gang in aiding and abetting the commission of the assault. Thus, the first element was satisfied.

B. *Second Element*

The mental element of the gang enhancement requires substantial evidence from which a jury can infer that in committing the gang-related criminal act, the defendant specifically intended to engage in or promote criminal gang conduct. (*Albillar, supra,* 51 Cal.4th at p. 68.) A finding of specific intent requires a subjective desire. (See 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 5, p. 204.) However, "[i]ntent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense." (*People v. Pre* (2004) 117 Cal.App.4th 413, 420.)

"There is no requirement in section 186.22, subdivision (b), that the defendant's intent to enable or promote criminal endeavors by gang members must relate to criminal activity apart from the offense the defendant commits. To the contrary, the specific intent required by the statute is 'to promote, further, or assist in *any* criminal conduct by gang

9

members.'  [Citation.]  Therefore, defendant's own criminal [act] qualifie[s] as the gang-related criminal activity.  . . .  [¶]  . . .  [T]here is no requirement in section 186.22 that the crime be committed with the intent to enable or further any other crime."  (*People v. Hill* (2006) 142 Cal.App.4th 770, 774.)  This is not to say, however, that a gang member's intent to merely commit the crime that promotes his own criminal act suffices to establish the specific intent required by the statute.  But when the circumstances surrounding the crime establish that the crime itself was related to the activities of the gang, an inference of specific intent to promote criminal conduct by gang members reasonably may be drawn.  (See *In re Frank S., supra,* 141 Cal.App.4th at p. 1199.)

Here, the evidence shows that Sanchez, Castro and Arellano were gang members.  During the fight, gang names were shouted.  Sanchez and Castro told Pimental that Arellano had "fucked up" one of their "homies."  In response to that show of disrespect by a rival gang member, Pimental directed Sanchez and Castro to attack Arellano.  A jury could reasonably infer from the circumstances of the assault and the customs and priorities of the Encanto gang that Pimental intended by his support and encouragement of Sanchez and Castro to boost the Encanto gang's reputation.  The expert testified that among gang members, respect from others was important to instill fear among rival gangs, permitting the Encanto gang to further its criminal interests.  We conclude that sufficient evidence supports the mental element of the gang enhancement.

III.

Pimental contends the court prejudicially erred by instructing the jury regarding flight because the evidence showed he "did not leave the immediate area where the

10

assault took place.  While he was seen near the trolley tracks he did not leave the area for some time."

The court instructed the jury with CALCRIM No. 372:  "If the defendant fled or tried to flee immediately after the crime was committed or after he was accused of committing the crime, that conduct may show that he was aware of his guilt.  If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct.  However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

Whenever the prosecution relies in part on evidence of the defendant's flight, the trial court has a sua sponte duty to instruct the jury with CALCRIM No. 372 or its equivalent.  (§ 1127c.)  "Evidence that a defendant left the scene is not alone sufficient; instead, the circumstances of departure must suggest a purpose to avoid being observed or arrested."  (*People v. Bonilla* (2007) 41 Cal.4th 313, 328, internal quotations omitted.)  Flight does not require the physical act of running or the reaching of a faraway haven.  (*People v. Wallace* (2008) 44 Cal.4th 1032, 1074.)  It only requires " ' "a purpose to avoid being observed or arrested." ' "  (*Ibid*.)

We review de novo the propriety of the giving of a jury instruction.  (*People v. Posey* (2004) 32 Cal.4th 193, 218.)  Further, we apply the harmless error standard provided in *People v. Watson* (1956) 46 Cal.2d 818, 836, in reviewing any error in giving the flight instruction.  (*People v. Silva* (1988) 45 Cal.3d 604, 628.)

Pimental evinced his intent to flee by first attempting to board the trolley immediately after the incident, notwithstanding that he abandoned that plan.  Next, when

11

a female approached him, he told her he needed to leave the crime scene and promptly left with her. The jury could reasonably infer from this evidence that Pimental left the trolley station to avoid police detection. We conclude sufficient evidence supported the court's decision to give the flight instruction.

We further conclude that assuming some error in giving the flight instruction, it was harmless. Pimental argues the instruction was prejudicial because he did not directly participate in assaulting Arellano, and the People's case relied solely on an aiding and abetting theory. He claims the case was a close one—as shown by the jury's lengthy deliberation and its questions to the court—and the "flight instruction could very easily have tipped the balance where the evidence was otherwise weak."

CALCRIM No. 372 does not assume the flight of the defendant, or that any such flight, if established, indicates guilt. The very terms of the instruction informed the jury that it first had to decide whether it believed that the defendant actually fled. Only if the jury were to make that preliminary finding would it proceed to decide the significance of that conduct. Further, the instruction benefits a defendant by cautioning the jury that flight, alone, cannot prove guilt. " 'The cautionary nature of the instruction[ ] benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory.' " (*People v. Boyette* (2002) 29 Cal.4th 382, 438-439.) Given the permissive nature of the instruction and its cautionary nature, even if giving of the instruction had been erroneous, Pimental could not demonstrate a reasonable probability that he would have obtained a more favorable verdict absent that instruction.

12

IV.

Pimental contends his conviction on counts 2 and 3 should be reversed because the court erroneously instructed the jury regarding aiding and abetting and the natural and probable consequences doctrine. Pimental specifically contends the court's instruction with CALCRIM No. 400 regarding aiding and abetting did not inform the jury that his culpability "must be based upon his own mental state and not the mental state of either Sanchez or Castro."

"Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) In determining whether error has been committed in giving jury instructions, we consider the instructions as a whole and assume jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given. (*Ibid.*) " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*Ibid.*) "The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions." (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

The trial court is required to instruct the jury on the general principles of law that are closely and openly connected with the evidence and that are necessary to the jury's understanding of the case. (*People v. Barker* (2001) 91 Cal.App.4th 1166, 1172.) It also has a duty to refrain from giving incorrect instructions or instructions on principles of law that are irrelevant and that would have the effect of confusing the jury or relieving it from

13

making findings on the relevant issues. (*Ibid*.; see *People v. Smithey* (1999) 20 Cal.4th 936, 976-977, fn. 7.)

A.

Generally, "the extent of an aider and abettor's liability is dependent upon his particular mental state, which may, under the specific facts of any given case, be the same as, or greater or lesser than, that of the direct perpetrator." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 624.)

The court instructed the jury with CALCRIM No. 400 as follows: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator. [¶] Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime." (See § 31.) This is an introductory instruction that sets out the basic principle that both direct perpetrators and those who merely aid and abet the commission of a crime are deemed to share criminal liability. (See *People v. Mendoza* (1998) 18 Cal.4th 1114, 1122 [holding that "an aider and abettor 'shares the guilt of the actual perpetrator' "].) Nothing in CALCRIM No. 400 states that the requirements for being a perpetrator and for being an aider and abettor are identical, nor would a reasonable juror have interpreted that language in such a manner.

14

The trial court instructed the jury on the intended crimes of aiding and abetting pursuant to CALCRIM No. 401 as follows:  "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:  [¶] 1.  The perpetrator committed the crime;  [¶]  2.  The defendant knew that the perpetrator intended to commit the crime;  [¶]  3.  Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;  [¶]  AND [¶]  4.  The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.  [¶]  Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.  [¶] If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.  [¶]  If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor.  However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor.  A person who aids and abets a crime is not guilty of that crime if he or she withdraws before the crime is committed.  To withdraw, a person must do two things:  [¶]  1.  He or she must notify everyone else he or she knows is involved in the commission of the crime that he or she is no longer participating.  The notification must be made early enough to prevent the commission of the crime.  [¶]  AND  [¶]  2.  He or she must do everything reasonably within his or her power to prevent the crime from being committed.  He or she does not

15

have to actually prevent the crime. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not withdraw. If the People have not met this burden, you may not find the defendant guilty under an aiding and abetting theory."

The trial court instructed the jury on the natural and probable consequences doctrine pursuant to CALCRIM No. 402, as follows: "Simple assault in violation of Penal Code section 240 is a lesser included offense of assault likely to produce great bodily injury and assault with a deadly weapon. [¶] The defendant is charged in count 2 with assault likely to produce great bodily injury in violation of Penal Code section 245 [subdivision] (a)(4) and in count 3 with assault with a deadly weapon in violation of Penal Code section 245 [subdivision] (a)(1). [¶] You must first decide whether the defendant is guilty of count 2 with assault likely to produce great bodily injury or the lesser included offense of simple assault. If you find the defendant is guilty of either of these crimes, you must then decide whether he is guilty of count 3 with assault with a deadly weapon. [¶] Under certain circumstances, a person who is guilty of one crime may also be guilty of other crimes that were committed at the same time. [¶] To prove that the defendant is guilty of assault with a deadly weapon, the People must prove that: [¶] 1. The defendant is guilty of simple assault or assault likely to produce great bodily injury as a direct perpetrator or aider and abettor; [¶] 2. During the commission of the simple assault or an assault likely to produce great bodily injury a co-participant in that simple assault or assault likely to produce great bodily injury committed the crime of assault with a deadly weapon; [¶] AND [¶] 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission [of]

16

assault with a deadly weapon was a natural and probable consequence of the commission of simple assault or an assault likely to produce great bodily injury. [¶] A co-participant in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. [¶] If the assault with a deadly weapon was committed for a reason independent of the common plan to commit the simple assault or assault likely to produce great bodily injury, then the commission of assault with a deadly weapon was not a natural and probable consequence of simple assault or assault likely to produce great bodily injury. [¶] To decide whether the crimes of simple assault or assault likely to produce great bodily injury were committed, please refer to the separate instructions that I will give or have given you on that crime. [¶] The People allege that the defendant originally intended to aid and abet the commission of either a simple assault or an assault likely to produce great bodily injury. The defendant is guilty of assault with a deadly weapon if the People have proved that the defendant aided and abetted either simple assault or assault likely to produce great bodily injury and that assault with a deadly weapon was the natural and probable consequence of either simple assault or an assault likely to produce great bodily injury. However, you do not need to agree on which of these two crimes the defendant aided and abetted." (Some capitalization omitted.)

Here, the court did not err in giving these instructions. The jury received evidence showing Pimental was aware of Sanchez's and Castro's intent to assault Arellano, and he

17

encouraged them. He also admitted that he would have had to face the consequences if he had tied to stop the attack. In light of CALCRIM No. 401, the jury could not have reasonably disregarded Pimental's mens rea in convicting him. Thus, the jury could only have convicted Pimental of assault under an aiding and abetting theory if it found that he specifically intended to aid Sanchez and Castro in the assault and knew of their unlawful purpose. If the jury found Pimental did not intend to aid in the crime, or aided in some lesser crime than Sanchez and Castro committed, then it would have had to acquit Pimental under an aiding and abetting theory.

## B.

Pimental contends that "the jury was asked only to determine whether the knife assault was a natural and probable consequence of one or more of the lesser crimes intended by [him]. The jury was not directed to determine whether Sanchez's mental state and intent was also a natural and probable consequence." Pimental claims that absent such a finding, he could not be held culpable for the offense that Sanchez committed. He further contends he "arrived during the course of a simple assault and, while it appears there was some limited contact between him, Sanchez, and Castro, [his belief] that the misdemeanor assault on Arellano would continue and elevate to a deadly assault was not proved. [He] could not reasonably foresee that the offense would elevate to an assault with a deadly weapon."

" 'A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended

18

crime.  The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. [Citation.]'  [Citation.]  Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' "  (*People v. Medina* (2009) 46 Cal.4th 913, 920; see *People v. Prettyman* (1996) 14 Cal.4th 248, 254.)  A reasonably foreseeable consequence is a factual issue to be resolved by the jury who evaluates all the factual circumstances of the individual case.  (*People v. Medina, supra,* 46 Cal.4th at p. 920.)

Here, the evidence established that Pimental knew before the second attack on Arellano that Sanchez was carrying a knife.  Nonetheless, Pimental encouraged Sanchez and Castro to attack Arellano.  That Sanchez would use the knife and that Arellano would suffer bodily injury from the assault were objectively foreseeable; therefore, as the properly instructed jury correctly found, under the doctrine of natural and probable cause, Pimental was guilty of aiding and abetting Sanchez's intended assault.  Pimental has provided us no basis for rejecting the jury's verdict.

DISPOSITION

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:

BENKE, Acting P. J.

AARON, J.